535 A.2d 1035

COMMONWEALTH of Pennsylvania, Appellant,

v.

Joseph D. TARBERT, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

William T. DANNAKER, III, Appellee.

Supreme Court of Pennsylvania.

Argued May 15, 1987.

Decided Dec. 29, 1987.

H. Stanley Rebert, Dist. Atty., Tyann L. Miller, Asst. Dist. Atty., Donald Lam, York, Dennis C. McAndrews, Asst. Dist. Atty., Susan L. Elias, Deputy Dist. Atty., for the Com.

William H. Poole, Jr., York, for Tarbert.

William Wismer, Media, for Dannaker.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

NIX, Chief Justice.

The instant appeals present a common issue, namely, whether the police may set up systematic roadblocks for the purpose of stopping and observing drivers to determine whether they are operating a motor vehicle under the influence of alcohol. In *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035, a panel of the Superior Court held that such roadblocks violated Article I, section 8 of the Pennsylvania Constitution, which prohibits unreasonable searches and seizures. In *Commonwealth v. Dannaker,* 517 Pa. 277, 535 A.2d 1035, a different panel of the Superior Court held that section 6308(b) of the Vehicle Code, 75 Pa.C.S. § 6308(b), prior to its amendment in 1985, did not authorize the police to conduct such roadblocks.

### I.

#### A. Tarbert

The police department of York Township, York County, established a roadblock on a county road in the early morning hours of July 30, 1983. The purpose of the roadblock was to check all motorists travelling in either direction on the road to determine if they were driving under the influence of alcoholic beverages. The two police officers assigned to the roadblock were in uniform and had

driven to the site in marked police cars. Their procedure was to stop a vehicle, ask to see the operator's license and registration, and attempt to ascertain the existence of any clues that would lead them to believe that the driver might be under the influence of alcohol. When appellee Joseph D. Tarbert was stopped, the police officer who had stopped him noticed the odor of alcohol emanating from Tarbert's vehicle and observed that Tarbert's eyes were slightly bloodshot. The officer also observed that Tarbert appeared confused and that he took several seconds to produce his license and registration. The officer asked Tarbert to pull off the highway and park beside a police car. After Tarbert emerged from his car the officer approached Tarbert's vehicle and noticed an open bottle of beer near the driver's seat. The police officer then asked Tarbert to submit to three field-sobriety tests, two of which he failed. As a result, Tarbert was placed under arrest and taken to the police station where he was advised of his rights and given a breathalyzer test. The breathalyzer reading was .12 percent. Tarbert signed a copy of the test results and was released. After a jury trial before the Court of Common Pleas of York County, Tarbert was convicted of driving with a blood alcohol level of .10 percent or more in violation of section 3731(a)(4) of the Vehicle Code, 75 Pa.C.S. § 3731(a)(4) (Supp.1987). He was sentenced to thirty days to twelve months' imprisonment and assessed a fine and the costs of prosecution. On direct appeal a panel of the Superior Court reversed the judgment of sentence, holding that the stop of Tarbert's vehicle pursuant to the roadblock violated Article I, section 8 of the Pennsylvania Constitution. *Commonwealth v. Tarbert*, 348 Pa.Super. 306, 502 A.2d 221 (1985). This Court subsequently granted the Commonwealth's petition for allowance of appeal.

## B. Dannaker

On April 7, 1984, pursuant to a discussion among six or seven officers and the police chief, and after consultation with the district attorney, the police department of Brookhaven Township, Delaware County conducted a drunk driving

roadblock on a main artery which had been the site of prior accidents and arrests for drunk driving. The assigned police officers were in uniform and wearing orange reflection vests. The lighting in the area of the roadblock was adequate and fifteen to twenty flares had been set up along the road. Three drivers at a time were directed to an observation area where a flashlight was shined in their eyes and they were informed of the nature of the roadblock and given pamphlets concerning driving under the influence. Other traffic was permitted to pass while each group of three vehicles was being detained. Appellee William T. Dannaker, III, was among the drivers stopped for observation. The police officer who approached Dannaker's vehicle observed that Dannaker's eyes were bloodshot and the smell of alcohol was on his breath. When Dannaker was asked to step out of his car, the officer noticed that Dannaker's speech was slurred and he was having difficulty maintaining his balance. As a result of these observations Dannaker was placed under arrest and transported to police headquarters, where the officer advised him of his rights and administered a breathalyzer test. Dannaker's blood alcohol level was registered as .11 percent. In pre-trial motions Dannaker challenged the legality of the stop of his vehicle under section 6308(b) of the Vehicle Code, 75 Pa.C.S. § 6308(b). The Delaware County Court of Common Pleas granted Dannaker's motion to suppress the results of the breathalyzer test and dismissed the charges against him. The Commonwealth appealed to the Superior Court, which affirmed the suppression order. *Commonwealth v. Dannaker*, 352 Pa.Super. 611, 505 A.2d 1030 (1985). We granted the Commonwealth's request for allocatur.

## II.

We granted review in the instant cases to determine an issue of first impression and far-reaching significance: whether police roadblocks designed to detect persons driving under the influence of alcohol are legally valid. To resolve that question we are called upon to determine whether such roadblocks are violative of this state's consti-

tutional prohibition against unreasonable searches and seizures, or, in the alternative, whether such roadblocks are unlawful for want of specific statutory authorization.

Article I, section 8 of the Pennsylvania Constitution provides:

### § 8. Security from searches and seizures

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. Art. I, § 8.

The role of this Court in interpreting the above constitutional protections was recently explained in *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983):

While minimum federal constitutional guarantees are "equally applicable to the [analogous] state constitutional provision," *see, e.g., Commonwealth v. Platou*, 455 Pa. 258, 260 n. 2, 312 A.2d 29, 31 n. 2 (1973), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), the state has the power to provide broader standards than those mandated by the federal Constitution:

It is well settled that a state may provide through its constitution a basis for the rights and liberties of its citizens independent from that provided by the Federal Constitution, and that the rights so guaranteed may be more expansive than their federal counterparts. *Prune-Yard Shopping Center v. Robins*, 447 U.S. 74, 80–82, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980); *see Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975); *Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967). See also *Commonwealth v. Ware*, 446 Pa. 52, 284 A.2d 700 (1971), cert. granted sub nom. *Pennsylvania v. Ware*, 405 U.S. 987, 92 S.Ct. 1254, 31 L.Ed.2d 453, subsequently vacated and denied, 406 U.S. 910, 92 S.Ct.

1606, 31 L.Ed.2d 821 (1972) ("it appearing that the judgment below rests upon an adequate state ground"). This Court has on numerous occasions recognized the Pennsylvania Constitution to be an alternative and independent source of individual rights. See, e.g. *Willing v. Mazzocone,* 482 Pa. 377, 393 A.2d 1155 (1978); *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975); *Commonwealth v. Knowles,* 459 Pa. 70,, 73 n. 3 327 A.2d 19, 20 N. 3 (1974); *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 451 L.Ed.2d 1146 (1974); *Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59 cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961). *Commonwealth v. Tate,* 495 Pa. 158, 169–70, 432 A.2d 1382, 1387–1388 (1981).

This Court has not hesitated to interpret the Pennsylvania Constitution as affording greater protection to defendants than the federal Constitution. *See, e.g., Commonwealth v. Bussey,* 486 Pa. 221, 404 A.2d 1309 (1979); *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d 62 (1975); *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974); *Commonwealth v. Campana,* 452 Pa. 233, 304 A.2d 432, vacated, 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), *on remand,* 455 Pa. 622, 314 A.2d 854, *cert. denied,* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

*Id.,* 504 Pa. at 63–64, 470 A.2d at 466–467.

While we are mindful of the limited nature of the protections guaranteed by the federal Constitution, we nonetheless find the large body of federal Fourth Amendment jurisprudence instructive and will accord weight to federal court decisions in interpreting Pennsylvania's constitutional protections where those decisions "are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees,...." Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489, 502

(1977), *quoted in Commonwealth v. Sell, supra,* 504 Pa. at 49, 470 A.2d at 459.

It is no longer open to question that the stopping of an automobile and the detention of its occupants is a seizure subject to constitutional restraints. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Commonwealth v. Murray,* 460 Pa. 53, 331 A.2d 414 (1975); *Commonwealth v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973). However, "one's expectation of privacy in an automobile and freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." *United States v. Martinez–Fuerte, supra,* 428 U.S. at 561, 96 S.Ct. at 3084. Moreover, "[a]utomobiles, unlike homes, are subject to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." *South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). Despite the fact that the vehicle and its use are subject to such regulations, the driver and passengers do not forfeit all reasonable expectation of privacy, and may not be subjected to unfettered governmental intrusion. *Delaware v. Prouse, supra.*

As the text of Article I, section 8 of our state constitution makes clear, the citizens of this Commonwealth may not be subjected to "unreasonable searches and seizures." The United States Supreme Court, interpreting the Fourth Amendment's identical phrase, has indicated that a finding of "reasonableness" may, in limited circumstances, be predicated upon less than the traditional requirement of probable cause.

> The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement agents, in order " 'to safeguard the privacy and security of individuals against

arbitrary invasions....'" *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 [98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978), quoting *Camara v. Municipal Court,* 387 U.S. 523, 528 [87 S.Ct. 1727, 1730, 18 L.Ed.2d 930] (1967). *Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.* Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon "some quantum of individualized suspicion," other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field," *Camara v. Municipal Court,* 387 U.S., at 532 [87 S.Ct. at 1733]. See *id.,* at 534–535 [87 S.Ct. at 1734]; *Marshall v. Barlow's, Inc., supra,* [436 U.S.] at 320–321 [98 S.Ct. at 1824–25]; *United States v. United States District Court,* 407 U.S. 297, 322–323 [92 S.Ct. 2125, 2139, 32 L.Ed.2d 752] (1972) (requiring warrants).

*Delaware v. Prouse, supra,* at 653–655 (footnotes omitted; emphasis added).

The balancing-of-interests approach to the determination of Fourth Amendment "reasonableness" finds its origin in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), a case involving a challenge to an ordinance permitting the code-enforcement inspection of residences. The *Camara* Court identified the basic purpose of the Fourth Amendment as the protection of the privacy and security of individuals against *arbitrary* invasions by government officials. *Id.* at 528, 87 S.Ct. at 173. In assessing the reasonableness of the governmental intrusion, the Court considered the strength of the public interest in effectively combatting the problem, and the ability to achieve acceptable results by other means, weighed against

the extent of the invasion of the citizen's privacy. *Id.* at 537, 87 S.Ct. at 1735.

In our recent decision in *Commonwealth v. Johnston,* 515 Pa. 454, 530 A.2d 74 (1987), this Court explicitly approved, for some circumstances, the balancing-of-interests approach for determining reasonableness under Article I, section 8 of the Pennsylvania Constitution.[1] That case involved the warrantless deployment of a narcotics detection dog to perform a "sniff-search" in a building where the police suspected illegal drugs were being stored. We noted that the considerable utility of this law enforcement procedure would be lost if traditional warrant requirements were imposed, and found the procedure's intrusiveness to be minimal provided the police had articulable and reasonable grounds for their suspicion and were lawfully present at the site of the search:

[A] canine sniff-search is inherently less intrusive upon an individual's privacy than other searches such as wiretapping or rummaging through one's luggage; it is unlikely to intrude except marginally upon innocent persons; and an individual's interest in being free from police harassment, annoyance, inconvenience and humiliation is reasonably certain of protection if the police must have a

1. In response to those members of the Court who would reject the balancing-of-interests approach, and in all instances require probable cause or at least reasonable suspicion, I strongly suggest that this situation is illustrative of an instance where such a requirement would be totally inadequate in protecting the welfare of the public. A motor vehicle improperly used is a deadly instrument. The statistics of highway fatalities establish that fact beyond cavil. To continue this carnage by insistance upon a standard which is obviously inappropriate to address the need would put an absurd gloss on Article I, section 8 of our constitution.

It must be stressed that the absence of the requirement of an individualized finding of probable cause or reasonable suspicion does not reflect an arbitrary intrusion upon the privacy of individuals. Under the constitutional constraints discussed in the body of the opinion, it is apparent that in determining the situs of the roadblock it must be established that the area chosen is one likely to be traversed by motorists who are under the influence. The departure from a requirement of probable cause or reasonable suspicion for each individual stop is counterbalanced by the nature of the evil sought to be addressed.

reason before they may, in the circumstances of this case, utilize a narcotics detection dog.

*Id.*, 515 Pa. at 466, 530 A.2d at 79–80 (footnote omitted).

This Court has never had occasion to pass on the constitutionality of a police roadblock. The leading case in this area is *United States v. Martinez–Fuerte, supra.* In that decision the United States Supreme Court upheld the constitutionality of the Border Patrol's routine stopping of a vehicle for brief questioning of its occupants at a permanent checkpoint set up as part of a program to apprehend illegal aliens. The Court, applying the *Camara* balancing test, rejected the contention that some reasonable suspicion that a vehicle contained illegal aliens was a Fourth Amendment prerequisite for a Border Patrol stop. After describing the magnitude of the illegal immigration crisis, the Court identified surreptitious entries as the most formidable obstacle to the government's efforts to stem the flow of illegal entrants across the Mexican border. *Id.* at 551–552, 96 S.Ct. at 3080. The Court found the public interest in the practice of routine stops at permanent checkpoints to be substantial, and stressed that the detection of this illegal activity would be severely hampered by the imposition of a "reasonable suspicion" requirement:

Our previous cases have recognized that maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border. We note here only the substantiality of the public interest in the practice of routine stops for inquiry at permanent checkpoints, a practice which the Government identifies as the most important of the traffic-checking operations. Brief for United States in No. 74–1560, pp. 19–20. These checkpoints are located on important highways; in their absence such highways would offer illegal aliens a quick and safe route into the interior. Routine checkpoint inquiries apprehend many smugglers and illegal aliens who succumb to the lure of such highways. And the prospect of such inquiries forces others onto less efficient roads that are less heavi-

ly traveled, slowing their movement and making them more vulnerable to detection by roving patrols. *Cf. United States v. Brignoni–Ponce*, 422 U.S., at 883–885 [95 S.Ct. at 2581–82].

A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens. In particular, such a requirement would largely eliminate any deterrent to the conduct of well-disguised smuggling operations, even though smugglers are known to use these highways regularly.

*Id.* at 556–557, 96 S.Ct. at 3082–83 (footnote omitted).

The *Martinez–Fuerte* Court next considered the nature of the intrusion on Fourth Amendment interests posed by routine checkpoint stops. As to the checkpoint's objective intrusion, the Court stressed that the stop and questioning were brief and that neither the occupants nor the vehicle were subjected to more than a visual inspection. *Id.* at 558, 96 S.Ct. at 3083. The Court found that the subjective intrusion, *i.e.,* "the generating of concern or even fright on the part of lawful travellers," resulting from a checkpoint stop was slight in comparison to that of random discretionary stops by roving patrols. *Id.* at 558, 96 S.Ct. at 3083. The Court noted several important distinctions between the two types of vehicle stops:

Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public

interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review.

*Id.* at 559, 96 S.Ct. at 3083–84 (footnote omitted).

The *Martinez–Fuerte* Court also rejected the alternative argument that routine stops at a checkpoint were permissible only if the location and the procedure employed at a particular checkpoint were judicially authorized by a warrant. The Court concluded that the traditional purposes served by a warrant were inapplicable. *Id.* at 565–566, 96 S.Ct. at 3086.

A systematic police roadblock to check for drivers under the influence of alcohol, frequently called a "DWI roadblock" or a "sobriety checkpoint," shares many of the features of the checkpoint considered in *Martinez–Fuerte.* One commentator has described a typical DWI roadblock as follows:

Although state and local procedures governing the conduct of DWI roadblock stops vary considerably, several basic features of the roadblock stop are identifiable. Roadblock stops are almost always conducted to achieve police objectives that cannot be met without some form of traffic control. DWI roadblocks are temporary checkpoints, unlike the permanent immigration checkpoints used by the United States government for the detection of illegal aliens. The site of the roadblock and the time of its operation are usually determined by administrative officers in the law enforcement department of the juris-

diction. These officers decide where and when to locate a DWI roadblock based on empirical data indicating that drunk drivers pose a particular problem at the respective location and time. Law enforcement officials usually do not attempt to secure prior judicial approval for either the location of the roadblock or the conduct of the stops.

A sign indicating that the motorist is about to be stopped and suggesting the nature of the stop may provide advance warning of the roadblock. Furthermore, checkpoint operations usually are marked by flashing lights, police vehicles, and the presence of uniformed officers. Field officers conducting the roadblock may stop all traffic, or they may use other neutral formulae for deciding which vehicles to stop. For example, the officers might detain every fifth or tenth car that approaches the roadblock. Additionally, officers may wave backed-up traffic through the roadblock if the traffic stoppage poses safety problems.

After a vehicle is stopped, the officer usually requests that the motorist produce his license and registration, and may ask the motorist a few questions to observe him and detect signs that he is under the influence of alcohol. Based on his observations of the motorist and his vehicle, the police officer will either wave the motorist through the roadblock or direct him to a secondary area for further investigation. In the latter case, the officer may order the driver out of the vehicle and require submission to roadside sobriety tests or a breathalyzer test. If the motorist fails these tests the officer will arrest the driver for driving while under the influence of alcohol.

Note, *Curbing the Drunk Driver Under the Fourth Amendment: The Constitutionality of Roadblock Seizures,* 71 Geo.L.J. 1457, 1460–63 (1983), *quoted in* 4 W. LaFave, *Search and Seizure* § 10.8(d), at 69–70 (2d ed. 1987).

■ In determining whether such a law-enforcement procedure would offend the Pennsylvania Constitution's proscription against unreasonable seizures, we are convinced

that a balancing test analogous to that employed under the Fourth Amendment is appropriate. *Cf. Commonwealth v. Johnston, supra.* We undertake our inquiry, however, with the caveat that the privacy interest guaranteed by Article I, section 8 must be accorded great weight. We observe also that our government is charged with the responsibility of protecting the safety of its citizens.

■ The Commonwealth obviously has a compelling interest in protecting its citizens from the danger posed by drunk drivers. We have observed that drunk driving exacts "terrible costs in human life, injury and potential...." *Commonwealth v. Lutz,* 508 Pa. 297, 313, 495 A.2d 928, 936 (1985). *See, e.g., Commonwealth v. Mikulan,* 504 Pa. 244, 249, 470 A.2d 1339, 1341 (1983) (800 killed and 19,499 seriously injured in alcohol-related traffic accidents in Pennsylvania in 1982); *Commonwealth v. Leninsky,* 360 Pa.Super. 49, 58, 519 A.2d 984, 989 (1986) (950 killed in alcohol-related traffic accidents in Pennsylvania in 1981). The problem posed by drunk drivers gives rise to a governmental interest much stronger than the problem of illegal immigration, whose consequences are primarily economic in nature. It is also clear that the public interest in removing from the highways drivers operating vehicles under the influence of alcohol from the highways cannot adequately be met by more traditional law enforcement procedures.

[A] rather strong argument can be made that mere patrol and stoppings based upon the *Terry* standard do not produce what the *Camara* Court referred to as "acceptable results." For one thing, even if a patrolling officer is fortunate enough to be in the vicinity where a drunk driver is operating his vehicle, it does not necessarily follow that the driver will at that particular time drive his car in such a fashion as to create a reasonable suspicion justifying a stop. And the chances of such observation in the first place are rather slight, given the substantial number of intoxicated drivers on the roads. As properly noted by a concurring Justice in [*State ex rel. Ekstrom v. Justice Court,* 136 Ariz. 1, 633 P.2d 992 (1983)]:

> The traditional system has left us far short of achieving the law's objective. * * * It is only fortuitous that an officer happens to be in a position to see a drunk entering the freeway on the off-ramp before that drunk happens to kill some innocent person. We are not likely ever to achieve the situation where there will be police officers available at closing time on a Labor Day weekend night at each of the locations where patrons shuffle from their favorite saloon to the parking lot, nor, I think, would we ever desire to have that many officers available.

It is by no means surprising, therefore, that it has been reliably estimated that only one of every 2,000 drinking drivers is apprehended.

4 W. LaFave, *supra*, § 10.8(d), at 72–73 (footnotes omitted).

Moreover, even if there were sufficient police manpower available to observe traffic for telltale signs of drunk driving, many impaired drivers would escape detection.

> A 1984 safety study by the National Transportation Safety Board indicated that without sobriety checkpoint programs, many alcohol impaired drivers believe they can avoid police detection by driving carefully. However, with the use of sobriety checkpoints, the general public's perception of the probability of detection and sanction is increased. [This] public perception has a strong basis in fact. While those drunk drivers arrested by roving patrols average a .169 to .20 blood alcohol content (BAC) level, drunk drivers arrested at Delaware sobriety checkpoints averaged a .14 BAC level. In light of the fact that a driver with a .10 BAC level has a six times greater likelihood of causing an accident than a sober driver, the effectiveness of sobriety checkpoints in detecting and removing drunk drivers with *dangerous* but significantly lower BAC levels is significant.

*Commonwealth v. Leninsky, supra* [360 Pa.Super.] at 60–61, 519 A.2d at 990–991 (footnotes omitted).

The intrusiveness, both objective and subjective, of a drunk-driving roadblock can be reduced to a constitutionally acceptable degree by the manner in which it is managed and conducted. In this regard the *Martinez–Fuerte* decision is instructive. For example, the conduct of the roadblock itself can be such that it requires only a momentary stop to allow the police to make a brief but trained observation of a vehicle's driver, without entailing any physical search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable in advance. The possibility of arbitrary roadblocks can be significantly curtailed by the institution of certain safeguards. First, the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.

In our view, a drunk-driver roadblock conducted substantially in compliance with the above guidelines would reduce the intrusiveness to a degree which, when balanced against the compelling public interest in apprehending such drivers, would not violate Article I, section 8 of the Pennsylvania Constitution. *Cf. Little v. State,* 300 Md. 485, 479 A.2d 903 (1984) (upholding similar roadblocks under state and federal constitutions); *Commonwealth v. Trumble,* 396 Mass. 81, 483 N.E.2d 1102 (1985) (same); *Lowe v. Commonwealth,* 230 Va. 346, 337 S.E.2d 273 (1985) (same). However, notwithstanding the foregoing conclusion, there remains the question of whether our state legislature had statutorily

restrained the power of the police to conduct roadblocks in connection with enforcing the motor vehicle laws.

### III.

■ Prior to this Court's decision in *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), the authority of police officers to stop motor vehicles was virtually unlimited. The legislative declaration of that broad authority was as follows:

> Any peace officer, who shall be in uniform, and shall exhibit his badge or other sign of authority, shall have the right to stop any vehicle, upon request or signal, for the purpose of inspecting the said vehicle, as to its equipment and operation, or manufacturer's serial number or engine number, and securing of such other information as may be necessary.

Act of April 29, 1959, P.L. 58, § 1221(B), 75 P.S. § 1221(B) (repealed 1976).

The language of that statute was clearly sufficiently expansive to permit roadblocks for the enforcement of any law pertaining to motor vehicles. In *Swanger*, however, this Court, in disapproving a random stop made pursuant to the above statute, held that the police could not constitutionally stop a motor vehicle in the absence of probable cause to believe there had been a violation of the Vehicle Code. We explicitly reserved judgment on the issue of systematic stops or roadblocks for the detection of violators. *Swanger, supra*, 453 Pa. at 110, 307 A.2d at 877. In apparent response to *Swanger*, the legislature repealed the 1959 statute and enacted in its place section 6308(b) of the 1976 Vehicle Code, which initially provided as follows:

> **(b) Authority of police officer.**—Any police officer may stop a vehicle, upon request or signal, for the purpose of inspecting the vehicle as to its equipment and operation, or vehicle identification number or engine number, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b) (1976).

Section 6308(b) was subsequently amended in 1983 to require, as the legal basis for stopping a vehicle, "articulable and reasonable grounds" to suspect a violation of the motor vehicle laws. As amended, the section stated:

> **(b) Authority of police officer.**—Whenever a police officer has *articulable and reasonable grounds to suspect a violation of this title,* he may stop a vehicle, upon request on signal, for the purpose of inspecting the vehicle as to its equipment and operation, or vehicle identification number or engine number, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.
>
> 75 Pa.C.S. § 6308(b) (as amended to July 22, 1983) (emphasis added).

The version of section 6308(b) which resulted from the 1983 amendment was the one in force when the roadblocks here in issue were conducted. By the express language of that provision the legal power of the police to stop vehicles, even for the purpose of enforcing the motor vehicle laws, was limited to circumstances in which the police officer in question had "articulable and reasonable grounds" to suspect a violation of those laws. Given the terms of that provision, the absence of the requisite "articulable and reasonable grounds" would preclude the police from ordering even a momentary stop of a vehicle.

The Commonwealth argues that section 6308(b) as then written was not intended to bar systematic vehicle stops. For that proposition, the appellant relies on the fact that the provision does not mention stops of that nature. However, for us to accept the appellant's argument, we would have to engraft upon the 1983 amendment an exception to the stated restriction. That, we may not do. Where the language of a statute is clear and unambiguous, a court may not, under the guise of construction, add matters the legislature saw fit not to include at the time. *Panik v. Didra,* 370 Pa. 488, 88 A.2d 730 (1952); *Altieri v. Allentown Officers' and Employes' Retirement Board,* 368 Pa. 176,

81 A.2d 884 (1951); *Kusza v. Maximonis,* 363 Pa. 479, 70 A.2d 329 (1950); *Commonwealth ex rel. Cartwright v. Cartwright,* 350 Pa. 638, 40 A.2d 30 (1944); *see Commonwealth v. Rieck Investment Corp.,* 419 Pa. 52, 213 A.2d 277 (1965). It is certainly within the legislature's province to restrict the authority of police officers, even if such a restriction shows a more scrupulous regard for private rights than constitutional principles demand. This is what the legislature did by the terms of the 1983 amendment of section 6308(b) of the Vehicle Code. That enactment, in requiring "articulable and reasonable grounds" to justify a police-ordered stop, withheld by necessary implication the power to stop a vehicle simply because the police decided to hold a roadblock, regardless of how inobtrusively or systematically conducted.

A more recent amendment to the Vehicle Code provides additional evidence that the General Assembly did not contemplate that the statute in force when the instant cases arose permitted investigatory roadblocks. In 1985, after these cases arose, the legislature further amended section 6308(b) of the Code as follows:

> **(b) Authority of police officer.**—Whenever a police officer *is engaged in a systematic program of checking vehicles or drivers* or has articulable and reasonable grounds to suspect a violation of this title, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b) (italicized language added by Act of June 19, 1985, P.L. 49, No. 20, § 10, effective in 60 days). With this amendment the legislature specifically addressed, for the first time, police authorization to conduct systematic stops without individualized suspicion of illegal activity.[2]

---

**2.** Notwithstanding the statement of some members of this Court that the legislative enactment of 1983 embraced systematic roadblocks, I

It cannot be doubted that the police powers of this Commonwealth are particularly broad in matters pertaining to highway safety. *E.g., Maurer v. Boardman,* 336 Pa. 17, 7 A.2d 466 (1939); *see Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979). Pursuant to its police powers the state may, by substantially complying with the guidelines set forth in this opinion, conduct systematic roadblocks for the purpose of removing drunk drivers from the highways. However, it is for the legislature to determine whether or not to exercise the full allowable scope of its powers in that regard. Although the legislature in 1985 specifically enacted a statute permitting police to systematically check vehicles and drivers—even in the absence of grounds to suspect a violation of the motor vehicle laws— the fact remains that in 1983, when the instant cases arose, the legislature's delineation of police authority was not such as to permit such stops.

We must conclude, therefore, that as to Tarbert and Dannaker each roadblock stop was unlawful. The illegality arises in those instances because the exercise of the police power therein exceeded the statutory parameters then in force. It is therefore the restraint upon the police power imposed by the General Assembly that requires our rejection of the procedures employed in these cases without a consideration of the constitutionality of that conduct. Since in each instance the breathalyzer test was the fruit of an unlawful seizure, the results of the tests were properly suppressed in the ensuing criminal prosecutions.

For the reasons set forth in this opinion, the order of the Superior Court in each of the instant cases is affirmed.[3]

am firmly convinced that the legislative history set forth above clearly establishes the contrary.

Absent a statutory provision, the full panapoly of police power would be available. The legislature in acting cannot expand upon that power. Thus its purpose in acting must necessarily be to restrict it. The 1985 enactment reflects a subsequent judgment on the part of the General Assembly to expand the parameters it had initially prescribed.

3. Although the Superior Court's decision in *Tarbert* was based on constitutional grounds, our affirmance of that order is based on the

ZAPPALA and PAPADAKOS, JJ., file concurring opinions.

FLAHERTY, J., concurs in the result.

LARSEN, J., files a dissenting opinion.

HUTCHINSON, Former J., did not participate in the decision of this case.

ZAPPALA, Justice, concurring.

While I agree with the result reached today by the Court, I disagree with its constitutional analysis and thus write separately to briefly explain my reasoning.

In *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983), we held that the protections of Art. I, § 8 of our State Constitution provide a greater protection than that apparently afforded by the Fourth amendment of the United States Constitution. While I agree with the Court that the "stopping of an automobile and the detention of its occupants is a seizure subject to constitutional restraints.", (at p. 1038) I disagree with the Court's discussion of *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987) and its reliance upon *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

In *Johnston*, we upheld a search of a hallway by trained canine dogs. In doing so, we explicitly disavowed the United States Supreme Court decision of *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and in fact adopted the dissent of Justice Brennan. The distinction in these two views is critical and relevant to the present case. In *Place*, the majority applied a balancing test between the individual and governmental interests to be protected in determining whether an unreasonable search had occurred, while the dissenters objected to this approach arguing that the balancing test was only appropri-

1983 statutory restriction. It is well-settled that we may affirm the decision of a lower court if it is correct for any reason. *E.J. McAleer & Co. v. Iceland Products, Inc.*, 475 Pa. 610, 381 A.2d 441 (1977); *Hader v. Coplay Cement Mfg. Co.*, 410 Pa. 139, 189 A.2d 271 (1963); *Sherwood v. Elgart*, 383 Pa. 110, 117 A.2d 899 (1955).

ate in a *Terry* situation.[1] We then concluded that the actions by the canine dogs were a search not susceptible to a balancing review but rather to a determination of probable cause. Since the police had *articulable facts* upon which to base their belief that drugs were present, Art. I, § 8 was not violated.

Since the Opinion Announcing the Judgment of the Court appears to be adopting the majority view in *Place* and justifies the D.U.I. roadblock on the basis of the balancing test, I cannot agree. Our Constitution has already set forth the standard to be applied in reviewing a search and/or seizure. Art. I, § 8 clearly states that no search or seizure may be conducted "without probable cause." We cannot pay lip service to this provision, a constitutional precept for over two-hundred years, in order to eradicate a deplorable problem of our current society (i.e. drunk driving). We are not confronted here with two competing constitutional rights which would require a balancing review. To uphold the constitutionality of the use of roadblocks to discover whether a driver is operating his vehicle under the influence of alcohol would in essence destroy constitutionally guaranteed protections to effect a solution to a social problem.

I must object as well to the attempt to create what is perceived to be a constitutionally sound legislative scheme for establishing roadblocks. This effort appears to be a reflexive response to the public concern over the social ill of drunken driving. However, the decision that the roadblocks are invalid because they lack statutory authority renders its discussion of the constitutional implications of the enactment of any legislative scheme an advisory opinion. Moreover, the judiciary should not seek to respond to the overwhelming sense of urgency engendered by society's attempt to control this problem. While basking in the plaudits of society, after taking such action the Court may soon realize it has diminished the rights our society had sought to give its greatest protection—that of a constitutional guarantee.

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Even under *Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276 (1969), in which we adopted the *Terry* exception to probable cause for a search and/or seizure, we required a *reasonable suspicion* that a crime was in process. Because of the restricted intrusion allowed under *Terry,* the United States Supreme Court in interpreting the Fourth amendment has permitted a stop based not upon probable cause but upon a reasonable suspicion. The balancing test required under *Terry* which today is mistakenly applied to the present appeal, involves a weighing of the intrusion applied after a determination of a reasonable suspicion. Now my brethren want to apply this balancing test to avoid a requirement of probable cause even though it has conceded that a roadblock is in fact a seizure. The result is that our personal liberties will be further restricted on a lower standard than that required under *Terry,* i.e. speculation. My brethren then appear to justify the eradication of the probable cause requirement by the difficulty in enforcing drunk driving laws. As Justice Brennan said in his dissent in *United States v. Martinez–Fuerte, supra,*

> There is no principle in the jurisprudence of fundamental rights which permits constitutional limitations to be dispensed with merely because they cannot be conveniently satisfied. Dispensing with reasonable suspicion as a prerequisite to stopping and inspecting motorists because the inconvenience of such a requirement would make it impossible to identify a given car as a possible carrier of aliens is no more justifiable than dispensing with probable cause as prerequisite to the search of an individual because the inconvenience of such a requirement would make it impossible to identify a given person in a high crime area as a possible carrier of a concealed weapon.

428 U.S. at 575–76, 96 S.Ct. at 3091, 49 L.Ed.2d at 1138–39. Thus, while the required end is admirable, the means employed does not justify that end.

I also find the reliance upon *United States v. Martinez– Fuerte, supra* unpersuasive. In *Martinez–Fuerte,* the United States Supreme Court accepted permanent border-

line checks as non-violative of the Fourth amendment. Surely no one can reasonably equate the protections of our borders from illegal aliens with the removal of drunk drivers off our highways. The intent and purpose of each search is quite different. In *Martinez–Fuerte,* the purpose of the search was to keep illegal aliens out of the country, not for the purpose of detecting criminal activity, while in the present case, the intent of the search was to discover criminal activity, i.e. drunken drivers. Therefore, the administrative search in *Martinez–Fuerte* was valid subject to reasonable implementation.

Since the Opinion Announcing the Judgment of the Court concedes that the stopping of vehicles at a roadblock is a seizure subject to constitutional restraints, I see no logical reason for ignoring our well-reasoned body of jurisprudence in the face of a societal illness. Our constitution requires a showing of probable cause before a search or seizure occurs. There existing no articulable facts of the commission of a crime upon which these D.U.I. roadblocks were based, I find them repugnant to our Constitution. Accordingly, I would affirm the Superior Court in both *Commonwealth v. Dannaker* and *Commonwealth v. Tarbert.*

PAPADAKOS, Justice, concurring.

I concur in the result reached by Mr. Chief Justice Nix that the systematic stop in this case, pursuant to legislative authority granted the police in the 1983 statute, was unlawful because the police failed to comply with the mandate of the statutory authority. The matter should rest there.

Unfortunately, the majority includes an extended discussion of constitutional issues which are unnecessary for the holding in this case. The opinion discusses at length and finds constitutional justification for non-discriminatory, systematic roadblocks by the police under well-defined parameters. With this conclusion, I can agree. But not in the context of this case. We have too often stated that when a case raises constitutional and non-constitutional issues, we should not reach constitutional issues if the case can proper-

ly be decided on non-constitutional grounds. *Krenzelak v. Krenzelak*, 503 Pa. 373, 469 A.2d 987 (1983); *Ballou v. State Ethics Commission*, 496 Pa. 127, 436 A.2d 186 (1981); *Richards v. Unemployment Compensation Board of Review*, 491 Pa. 162, 420 A.2d 391 (1980); *Estate of Grossman*, 486 Pa. 460, 406 A.2d 726 (1979); *Commonwealth v. Mason*, 483 Pa. 409, 397 A.2d 408 (1979); *Mt. Lebanon v. County Board of Elections*, 470 Pa. 317, 368 A.2d 648 (1977).

Because of the inclusion of this obiter dictum, I am constrained to concur in the result.

LARSEN, Justice, dissenting.

I strongly dissent to the majority's invalidation of roadblock stops of motor vehicles for the purpose of observing drivers to determine whether they are operating a motor vehicle under the influence of alcohol. I would uphold the legality of said roadblock stops.

The majority erroneously holds that the 1983 version of 75 Pa. C.S.A. § 6308(b) "by necessary implication" restricted the police powers and prohibited the police roadblock procedures employed herein. The majority reasons that legislative grants of authority to police officers to stop vehicles under specific circumstances necessarily precluded the stopping of vehicles under all other circumstances. I do not agree that these grants of authority can restrict the exercise of legitimate police powers.

In 1985, the General Assembly did pass specific legislation explicitly authorizing a "police officer ... engaged in a systematic program of checking vehicles or drivers" to stop a vehicle upon request or signal to "secure such other information as the officer may reasonably believe to be necessary to enforce the provisions" of the Motor Vehicle Code. 75 Pa.C.S.A. § 6308(b), Authority of police officer (Purdon's supp. 1987). (This amendment to the Code was enacted in apparent response to the cases before us in this appeal.) Prior to 1985, the Code did not specifically authorize such systematic roadblock stops, but neither did it

prohibit them. In my view, the pre–1985 absence of specific legislative authorization for systematic roadblock stops is not fatal to the police procedures employed by the municipalities involved in this appeal.

Statutes do not authorize each and every enforcement method that a police officer might use in performing his or her duties. Statutes specifically authorize certain methods and mechanisms of enforcement, and specifically prohibit others. However, some actions that a police officer takes are not found in statutes because authority for those actions emanates from the officer's traditional and inherent authority under the "police powers." As we stated in *Commonwealth v. Mikulan,* 504 Pa. 244, 247, 470 A.2d 1339, 1340–41 (1983):

> [I]t has been said that probably the most important function of government is the exercise of the police power for the purpose of preserving the public health, safety and welfare, and it is true that, to accomplish that purpose, the legislature may limit the enjoyment of personal liberty and property.... *The police powers of the Commonwealth are particularly broad in matters pertaining to the safety and efficient functioning of the highways, ... and are perhaps strongest in matters pertaining to the sale, consumption and regulation of alcoholic beverages....* With section 3731(a)(4), [establishing a maximum permissible blood alcohol content of 0.10%] the legislature has exercised its broad police powers in these areas in an attempt to halt, or at least to retard, the wanton and senseless slaughter of and injury to innocent people upon our highways caused by drunk drivers. In *South Dakota v. Neville, supra,* [459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)] the United States Supreme Court recently rejected a claim that the admission into evidence of an alleged drunk driver's refusal to submit to a blood-alcohol test violates his Fifth Amendment privilege against self-incrimination. In so holding, that Court stated:

The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy....

459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748.... When we consider [that "the slaughter on the highways of this Nation exceeds the death toll of all our wars,"] that over three-quarters of a million human beings are seriously, and often permanently, injured and maimed as a result of alcohol related accidents, the emotional trauma and economic loss experienced by the victims and their families, and the millions of dollars of property damage, *it is easy to see that society is faced with a problem of frightening and epidemic dimensions.* (Emphasis added; some citations omitted.)

Given that the "police powers" reach their zenith in matters pertaining to the control of intoxicating liquor and the prohibition of intoxicated drivers of vehicles from our highways, I would hold that those charged with the responsibility of enforcing the Motor Vehicle Code may utilize any *reasonable* procedure upon our highways to achieve that goal so long as the procedure is not prohibited by the constitution, statute or precedent. I believe the source of the authorization to utilize the police procedures in question here lies in the inherent police powers of the state and its political subdivisions. Moreover, *there is statutory authorization* for such procedures, albeit general.

Section 6109 of the Code provides that "The provisions of this title shall not be deemed to prevent the ... local authorities on streets and highways within their physical boundaries from *the reasonable exercise of their police powers.*" 75 Pa.C.S.A. § 6109(a). This provision then enumerates twenty-three specific items which are "presumed to be reasonable exercises of police power," but this list is not exclusive nor does it purport to be. The majority makes it

clear by its discussion of the constitutionality of systematic "DUI" roadblocks that this police procedure is a "reasonable exercise of the police powers." *See* majority slip op. at 1037–1043, section II. On the one side of the ledger is the danger, devastation and destruction caused by drunken drivers upon our public highways and the need for effective mechanisms to prevent that carnage from taking its awesome toll, and on the other side is the relatively minimal intrusion upon a person's right to travel this Commonwealth's highways. There is no contest … the method chosen by the municipalities herein to enforce the Motor Vehicle Code's proscriptions against drinking and driving is obviously a reasonable exercise of the police powers, and is authorized, therefore, by Section 6109.

> As the New York Court of Appeals has stated:
>
> There can be no question that substantial reductions have occurred since 1980 in the deaths, injuries, and damage resulting from drunk driving. The extent to which those results stem from legislative reforms during that period as distinct from the deterrent effect of roadblocks and other educational and public information programs aimed at combatting the problem is not revealed, but in our view is not of constitutional moment. It is enough that such checkpoints, when their use becomes known, do have a substantial impact on the drunk driving problem. *The State is entitled in the interest of public safety to bring all available resources to bear,* without having to spell out the exact efficiency coefficient of each component and the separate effects of any particular component.

*People v. Scott,* 63 N.Y.2d 518, 528–29, 483 N.Y.S.2d 649, 653–54, 473 N.E.2d 1, 5–6 (1984) (emphasis added). So too, our municipalities are entitled, in the interest of public safety, to bring all reasonable "available resources" (i.e., those reasonable exercises of police power not prohibited by constitution, statute or precedent) to bear on the pernicious social phenomenon known as drunk driving and these reasonable available resources include roadblock stops.

Therefore, I dissent and would reverse the orders of Superior Court.