691 A.2d 466

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Steven Dennis PACEK.**

Superior Court of Pennsylvania.

Argued Dec. 12, 1996.

Filed Feb. 13, 1997.

Reargument Denied April 24, 1997.

James K. Gilmore, Assistant District Attorney, Pittsburgh, for Commonwealth, appellant.

Carol Rosen, Pittsburgh, for appellee.

Before BECK, JOHNSON and BROSKY, JJ.

BROSKY, Judge.

The Commonwealth of Pennsylvania ("Commonwealth") appeals from the January 26, 1996 trial court suppression order granting defendant-appellee Steven Dennis Pacek's ("Pacek") motion to suppress the results of field sobriety tests and an intoxilyzer test performed upon Pacek.

During June and July, 1994, Monroeville (Municipality of Monroeville, PA) Police Assistant Chief Leonard Tinsley reviewed Monroeville Police statistics regarding driving under the influence ("DUI") related traffic accidents on Pennsylvania Route 22 (also known as William Penn Highway) in Monroeville during the time period of 1989–1993. The statistics indicated "the time, date and location of [accidents] during" 1989–1993. N.T., 12/14–15/95, at 15. Assistant Chief Tinsley determined that a DUI checkpoint should be implemented on Route 22. On June 21, 1994 Tinsley sent a memorandum, to Monroeville Police Corporal Ronald Harvey, authorizing a DUI checkpoint to be conducted on Route 22 eastbound, approximately at the intersection with Old William Penn Highway, beginning at 11:00 p.m. on July 2, 1994 and concluding at 4:00 a.m. on July 3, 1994.[1]  *Id.* at 15–16. Tinsely chose that location and time period because the 1992–1993 statistics showed numerous DUI arrests in proximity to the proposed 1994 DUI checkpoint, and, the 1994 checkpoint would occur on a holiday weekend (Independence Day weekend). *Id.* at 16.

Corporal Harvey selected the exact situs of the DUI checkpoint, choosing

a high visibility area so that motorists could see the warning signs coming, approaching us well ahead of time so it

---

1. The DUI checkpoint was a cooperative effort of the Monroeville Police Department and the Plum Borough Police Department.

wouldn't cause a traffic hazard, but also that there would be a sufficient place to interview these vehicles [Sic] without causing a traffic hazard and letting them move on their way, again without putting anybody in jeapordy [Sic] as far as safety goes. . . .

*Id.* at 55. Assistant Chief Tinsley approved the site.

Corporal Harvey then authorized the following article on page A–2 of the June 29, 1994 *Times Express* (a weekly Monroeville area newspaper):

**DUI CHECKPOINTS SCHEDULED[.]**

Monroeville and Plum police departments announced they will conduct sobriety checkpoints on Route 22 in Monroeville between today (Wednesday) and Saturday.

A joint DUI task force was formed between the two departments to conduct the operations, during which motorists are stopped to check for drunk drivers and vehicle safety violations. Motorists will be delayed only a minute or two while passing through the checkpoints, which can be conducted at any time of day or night, and will be asked to complete a survey regarding the operation.

Commonwealth's Exhibit No. 5.

At approximately 11:00 p.m. on the evening of July 2, 1994 Corporal Harvey implemented the DUI checkpoint on Route 22 eastbound, approximately at the intersection with Old William Penn Highway. Approximately 500 feet from the checkpoint the police placed a "large orange sign" stating "Slow Down" (there were orange cones and traffic flares under the sign). N.T., 12/14–15/95, at 67. Approximately 250 feet past the first sign, the police placed a "large orange sign" stating "Sobriety Checkpoint Ahead" (there were cones and flares under the sign). *Id.* A third sign stated "Slow Down" and a fourth sign stated "Have Driver's License Ready". *Id.* All of the signs at the checkpoint were reflective as well as lighted by the traffic flares. *Id.* Another sign stated "Be Prepared to Stop". *Id.* at 72. In total, there were twelve signs at the checkpoint. *Id.*

Route 22 eastbound has two lanes, as does Route 22 westbound; the eastbound and westbound lanes are separated by a concrete "Jersey barrier" (the Jersey barrier is a low concrete wall that separates traffic lanes and prevents vehicles from making a "U-turn" into traffic lanes where the vehicles are flowing in the opposite direction). *Id.* at 72. The posted speed limit on Route 22 is 45 m.p.h. Once vehicles reached the second sign the drivers were interviewed (while in their vehicles) on Route 22 or were asked to pull their vehicles off to the side of the roadway. There were five teams of police officers (two officers per team); one officer would interview the driver while the second officer would position himself or herself in proximity to the passenger-side door (as a safety back-up for the interviewing officer). *Id.* at 69. The officers attempted to limit each interview to a 30 second time period.[2] The police intended to interview the drivers of all vehicles traveling eastbound on Route 22. *Id.* at 75. Vehicles could enter the lane to make a left turn, northbound, onto Old William Penn Highway; if the turning vehicles had a green traffic signal the drivers were not interviewed, but, if drivers were stopped for a red traffic signal they were subject to being interviewed as they sat in their vehicles (only a portion of the stopped drivers were interviewed).[3] *Id.* at 74, 75. If a vehicle made an illegal movement over the cement median strip at the intersection with Old William Penn Highway[4] (in an attempt to make a U-turn and travel westbound on Route 22), the vehicle was stopped because of the violation of the Vehicle Code. *Id.* at 76, 77. Once vehicles had exited Pennsylvania Route 376 (also known as the "Parkway") onto Route 22 eastbound, there was virtually no way for them to avoid the DUI checkpoint. *Id.* at 80.

2. The DUI checkpoint was stopped three or four times that evening when the traffic on Route 22 became too "backed-up", and restarted when traffic conditions permitted the police to again direct vehicles to the side of the roadway. N.T., 12/14–15/95, at 70.

3. The police only interviewed drivers, who were in the left-turn lane, when they "weren't busy moving traffic into the side road." N.T., 12/14–15/95, at 78.

4. At the intersection the Jersey barrier ended and was replaced by a three inch high concrete median strip.

Approximately 367 vehicles passed through the DUI checkpoint. Five drivers were interviewed at a time, and the line of vehicles averaged 15 (although at one point there was a line of 20 vehicles). *Id.* at 85. Whenever the traffic became too heavy the signs and flares were removed and traffic was permitted to move unimpeded (no interviewing took place).

At approximately 1:30 a.m. on July 3, 1994 appellee Pacek drove up to the checkpoint and was interviewed by Plum Borough Police Officer Lanny Conley. Officer Conley asked Pacek for his driver's license and registration; Conley "detected a strong odor of intoxicating beverage on [Pacek's] breath and noted that he had glassy eyes." *Id.* at 91. Pacek was directed to the "field sobriety interview area", which was being staffed by Monroeville Police Lieutenant David Palermo.

Palermo testified at the suppression hearing that appellant had "a slight sway", "his eyes were glassy" and that he emanated an odor of an alcoholic beverage. *Id.* at 97. Pacek passed the "heel to toe" field sobriety test, but failed a balance test (in which he was asked to balance on one foot and count to ten); Pacek could not keep his balance and had difficulty counting. *Id.* at 98. Palermo then arrested appellant for driving under the influence of alcohol ("DUI").[5] An intoxilyzer test was subsequently performed upon Pacek.

On April 6, 1995 Pacek filed an omnibus pretrial motion to dismiss and a motion to suppress. The trial court held a suppression hearing on December 14–15, 1995.[6] The trial court determined that the DUI checkpoint .was improperly conducted and it suppressed the results of the field sobriety tests and the intoxilyzer test performed upon Pacek; the trial court reasoned that the DUI checkpoint took motorists "by surprise ... because of imperfect public notice and the even-

5. Pacek was charged with three counts of DUI: [1] 75 Pa.C.S. § 3731(a)(1), [2] 75 Pa.C.S. § 3731(a)(4) and [3] 75 Pa.C.S. § 3731(a)(5)(i) or (ii).

6. Defendant-appellee Pacek presented no evidence at the suppression hearing.

tual placement of the 'warning' signs." Trial Court Opinion, 5/23/96, at p. 4. The Commonwealth then filed this appeal.

The Commonwealth claims on appeal:

The suppression court erred in concluding that the DUI checkpoint was improperly operated; sufficient notice of the checkpoint as contemplated by the Supreme Court's opinions was given so as to avoid "unnecessary surprise," and there is no merit to the suppression court's legal conclusion that motorists must be given an opportunity to avoid the checkpoint.

Commonwealth's Brief at 14. We reverse the trial court suppression order.

Our Court stated in *Commonwealth v. Dunkley,* 451 Pa.Super. 109, 678 A.2d 789 (1996),

In reviewing an order granting a motion to suppress, an appellate court may consider only the evidence of the defendant's witnesses and so much of the Commonwealth's evidence that, read in the context of the record as a whole, remains uncontradicted. Furthermore, our scope of appellate review is limited primarily to questions of law. We are bound by the suppression court's findings of fact if those findings are supported by the record. Factual findings wholly lacking in evidence, however, may be rejected. [Citations omitted.]

*Id.* at , 678 A.2d at 791.

75 Pa.C.S. § 6308(b) states,

**Authority of police officer.** Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has articulable and reasonable grounds to suspect a violation of this title, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

*Id.*

Our Court stated in *Commonwealth v. Ziegelmeier,* 454 Pa.Super. 330, 685 A.2d 559 (1996),

[I]t is well established that the stopping of an automobile and the detention of its occupants is a seizure subject to constitutional restraints under the Unites States[7] and Pennsylvania Constitutions.[8]  *Commonwealth v. Blouse,* 531 Pa. 167, 169, 611 A.2d 1177, 1178 (1992).  However, if the police follow specified procedures, systematic, non-discriminatory, non-arbitrary roadblocks for the purpose of insuring safety of the highways have been deemed constitutional.[9]  *Id.* [Citation omitted.]

*Id.* at 334, 685 A.2d at 561.

In *Commonwealth v. Blouse, supra,* our Supreme Court adopted the DUI checkpoint guidelines enunciated in its plurality decision in *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035 (1987).  The guidelines are as follows:

The conduct of the roadblock itself can be such that it requires only a momentary stop to allow the police to make a brief but trained observation of a vehicle's driver, without entailing any physical search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable road-blocks can be significantly curtailed by the institution of certain safeguards.  First[,] the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administra-

7.  The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be search, and the person or things to be seized."  U.S. Const., amend. IV.

8.  Article 1, § 8 of the Pennsylvania Constitution states: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or thing shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant."  Pa. Const., Art. 1, § 8.

9.  The statutory authority for police roadblocks or checkpoints is derived from 75 Pa.C.S. § 6308(b).  *Commonwealth v. Ziegelmeier,* 454 Pa.Super. 330, 685 A.2d 559 (1996).

tive approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection its is essential that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.

Substantial compliance with the guidelines is all that is required to reduce the intrusiveness of the search to a constitutionally acceptable level.

*Commonwealth v. Blouse, supra* at 172, 611 A.2d at 1180, quoting from *Commonwealth v. Tarbert, supra* at 293, 535 A.2d at 1043. *See* also *Commonwealth v. Kendall,* 437 Pa.Super. 139, 649 A.2d 695 (1994).

██ In the instant case the trial court determined that the operation of the DUI checkpoint failed to comport with one of the requirements of *Commonwealth v. Blouse, supra:* The trial court determined that motorists were subjected to "unfair surprise" since the newspaper article was insufficient to warn them of the DUI checkpoint, and, the placement of the checkpoint signs was insufficient to warn motorists of the checkpoint (the trial court avers that "there was no way to avoid ... the roadblock"). Trial Court Opinion, 5/23/96, at p. 4.[10]

10. The trial court's findings impliedly establish that it found all of the other requirements of *Blouse* to have been met [i.e., the checkpoint was conducted as to only require a momentary stop of motorists; the decision to operate the checkpoint (as well as the decision as to its time and place) was made pursuant to prior administrative approval (Assistant Chief Tinsley made the decision); the route and time selected for the checkpoint was one which, based upon local experience (in this case, reliance upon the 1989–1993 local statistics showing numerous DUI arrests in proximity to the proposed 1994 checkpoint, and, the fact that the checkpoint would occur on a holiday weekend), is likely to be travelled by intoxicated drivers; and, the decision regarding which vehicles to stop was made in accordance with objective standards prefixed by administrative decision]. *Commonwealth v. Blouse, supra.*

We do not find that the motorists in the instant case were subjected to "unfair surprise" regarding the DUI checkpoint. Our Supreme Court stated in *Blouse* that, "To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable in advance." *Commonwealth v. Blouse, supra* at 172, 611 A.2d at 1180. The majority in *Blouse* relied upon *Commonwealth v. Tarbert, supra,* which stated,

A sign indicating that the motorist is about to be stopped and suggesting the nature of the stop may provide *advance warning* of the roadblock. Furthermore, checkpoint operations usually are marked by flashing lights, police vehicles, and the presence of uniformed officers. Field officers conducting the roadblock may stop all traffic, or they may use other neutral formulae for deciding which vehicles to stop. For example, the officers might detain every fifth or tenth car that approaches the roadblock. Additionally, officers may wave backed-up traffic through the roadblock if the traffic stoppage poses safety problems.

After a vehicle is stopped, the officer usually requests that the motorist produce his license and registration, and may ask the motorist a few questions to observe him and detect signs that he is under the influence of alcohol. Based on his observations of the motorist and his vehicle, the police officer will either wave the motorist through the roadblock or direct him to a secondary area for further investigation. In the latter case, the officer may order the driver out of the vehicle and require submission to roadside sobriety tests or a breathalyzer test. If the motorist fails these tests the officer will arrest the driver for driving while under the influence of alcohol. [Emphasis added.]

*Id.* at 290, 535 A.2d at 1041.

Neither *Blouse* nor *Tarbert* mandate that the police must place advance notice, of the DUI checkpoint, in any local or regional publication.

We agree with the trial court that the aforementioned requirements were met.

First, as mentioned, *supra,* the police did provide Monroeville area residents with three days notice, posted in the *Times Express* (a weekly Monroeville area newspaper), regarding the instant DUI checkpoint (the notice advised motorists that the checkpoint could be operated anytime from June 29, 1994 through July 2, 1994—day or night—and the instant checkpoint began at 11:00 p.m. on July 2, 1994).

Furthermore, the police placed 12 bright orange, reflective signs, illuminated by flares, to give motorists advance warning of the instant DUI checkpoint. The language written on the signs, which is referred to, *supra,* clearly advised motorists in advance that they were about to encounter a DUI checkpoint. The checkpoint was staffed by uniformed Monroeville and Plum Police Officers. Substantial compliance with the *Blouse* guidelines is all that is mandated, and we find that the June 29, 1994 newspaper article and the signs placed at the DUI checkpoint clearly constituted substantial compliance with the Blouse requirement of avoiding unnecessary surprise to motorists (*i.e.,* the checkpoint was "ascertainable from a reasonable distance or otherwise made knowable in advance"). *Commonwealth v. Blouse, supra* at 172, 611 A.2d at 1180.

Additionally, neither *Blouse* nor *Tarbert* suggest that motorists approaching a DUI checkpoint must be afforded an opportunity to avoid the checkpoint. We refuse to add that requirement to those already outlined in *Blouse.* The purpose of a DUI checkpoint is to permit law enforcement officers to remove intoxicated drivers from our roadways before they may inflict bodily injury to others or themselves, or, cause property damage. Giving an intoxicated driver the opportunity to avoid the checkpoint would be contrary to principles of common sense, and, contrary to the objectives of the police in establishing the DUI checkpoint.

Since we have determined that appellee Pacek was not subjected to "unfair surprise" when he encountered the instant checkpoint, and we find that appellee need not have been afforded an opportunity to avoid the DUI checkpoint, we find that the trial court erred in suppressing the results of field

sobriety tests and an intoxilyzer test performed upon appellee. Therefore, we reverse the January 26, 1996 trial court suppression order.

Order reversed. Jurisdiction relinquished.