**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 37 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 1721 EDA |
| | : | 2022 entered on July 28, 2023, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Philadelphia County Court of |
| | : | Common Pleas at No. CP-51-CR- |
| ANTHONY LEWIS, | : | 0007345-2021 entered on June 30, |
| | : | 2022. |
| Appellant | : | |
| | : | ARGUED: March 4, 2025 |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: September 25, 2025**

We granted discretionary review to consider the quantum of evidence necessary to prove an area is high in crime, such that a suppression court may properly consider that fact among the totality of the circumstances when assessing whether reasonable suspicion existed at the time of a stop. More specifically, appellant Anthony Lewis asks us to impose a strict, multi-element test on the Commonwealth anytime it wishes to designate the scene of a stop as a "high-crime area." We decline the invitation. For the reasons that follow, we leave it to the discretion of suppression courts to determine whether the Commonwealth has proven an area is high in crime, as well as how much weight to assign to this factor. In so doing, we urge suppression courts to review high-crime area designations with caution and emphasize that merely intoning buzzwords is never sufficient to prove an area is high in crime. Applying these principles to this case,

we find the evidence supports the suppression court's conclusion that the scene of the stop was a high-crime area. We further hold the police had reasonable suspicion to conduct an investigatory detention based on the totality of the circumstances, including the high-crime nature of the area. Accordingly, we affirm the order of the Superior Court upholding the denial of suppression.

## I. Background

On July 31, 2021, Police Officers Jacob Whatley and Michael Brush were on routine patrol around the 1200 block of West Dauphin Street in Philadelphia when they noticed a group of at least four or five men who appeared to be gambling.[1] The officers pulled over their patrol car to investigate, without turning on their lights or sirens. But the officers did not have a chance to speak to the men. As soon as Officer Brush opened his car door, Lewis, who was standing among the group and carrying a black leather bag, looked directly at Officer Brush, his eyes "got extremely wide[,]" and he fled. N.T. Suppression Hearing, 12/8/21, at 16. The other men ran off in different directions. Officer Brush pursued Lewis but lost sight of him briefly when Lewis ducked into an alleyway. He caught up to Lewis in the alleyway a few seconds later after Lewis was stopped by a six-foot wooden fence. As the officer handcuffed Lewis, he noticed Lewis was no longer carrying his bag. When the police searched the area, they found the bag discarded on

---

[1] In Philadelphia, street gambling is prohibited by city ordinance. *See* Philadelphia City Code §10-612(1) ("No person shall gamble or set up, establish or conduct a gambling operation on any street, sidewalk alleyway, passageway, or other public right-of-way, or on any property owned by the City or other public agency. For purposes of this Section, to 'gamble' shall include, but not be limited to, playing for money (or any other thing of value) any of the following: 'three card monte', blackjack, spades, or other card game; and craps or other dice game; causing or attempting to cause dogfights (for financial gain or profit)."); *id.* at §10-612(2) ("No person shall attempt to gamble, incite others to gamble, or attempt to set up, establish or conduct a gambling operation on any street, sidewalk, alleyway, passageway, or other public right-of-way, or on any property owned by the City or other public agency.").

the opposite side of the fence with a loaded firearm inside. DNA evidence later linked Lewis to the firearm.

Lewis filed a motion to suppress the gun under the United States and Pennsylvania Constitutions, arguing the police lacked reasonable suspicion to pursue him. At the suppression hearing, the Commonwealth presented testimony from Officers Whatley and Brush. Officer Whatley testified he had been "assigned to that sector[2] almost on a daily basis" for nearly three years and "very frequently" observed people gambling. *Id.* at 11. Although the officer had not personally arrested anyone for gambling on that particular corner, he explained he had "[a] lot" of encounters with people gambling on the street and was aware gambling was "a very common thing in this area." *Id.* at 12. Based on his experience, Officer Whatley believed the group of men he observed were gambling. *See id.* at 9 ("they appeared to be gambling"); *id.* at 12 ("when I was driving down the block, . . . I got close enough to observe th[at] gambling was occurring"). In support, he pointed to the "manner they were standing[,]" which was "pretty close together," and the fact he "[saw] money in some of the individual[s'] hands as well as cards in other individual[s'] hands." *Id.* at 9. Officer Whatley could not "recall if [he] saw [Lewis] specifically gambling" but noted Lewis "was within th[e] group of individuals that were." *Id.* at 13.[3]

Upon prompting from counsel for the parties, the officers also broadly testified that the "whole police service area" was "very well known for [its] high-crime rate[.]" *Id.* at 20. In addition to gambling, Officer Whatley described the area as being "known for narcotic sales," and he explained that "in the relatively recent past there's been a lot of carjacking

---

[2] "The 22nd District is divided into four sections of patrol. [The 1200 block of West Dauphin Street falls within] service area one." N.T. Suppression Hearing, 12/8/21, at 20.

[3] During his testimony, Officer Whatley suggested the interaction was captured on police video. *See id.* at 9 ("We caught everybody on camera. And they appeared to be gambling."). However, no footage was introduced at the hearing, and it is not part of the certified record on appeal.

in that area as well." *Id.* at 11. Officer Brush, who stated he "know[s] the area very well[,]" added that it "is known to be very dangerous." *Id.* at 23-24. He specifically mentioned there had been one homicide and multiple carjackings within two blocks of 1200 West Dauphin Street in the month preceding the suppression hearing. *See id.* at 20.

After hearing argument from the parties, the trial court denied the motion to suppress the gun. The court credited the officers' testimony that they observed perceived gambling in a "known area for gambling[.]" *Id.* at 24. Because the officers already had a reason to suspect illegal activity, the court concluded Lewis's "unprovoked flight" in that "high-crime area" gave them reasonable suspicion to pursue him and conduct an investigatory stop. *Id.* at 26.

Following the denial of his suppression motion, Lewis proceeded immediately to a bench trial before the same judge. The trial court convicted him of possessing a firearm while prohibited from doing so, carrying a firearm without a license, and carrying a firearm in public in Philadelphia. *See* 18 Pa.C.S. §§6105, 6106, and 6108. The court imposed an aggregate sentence of two to four years' imprisonment, with two years' probation. Lewis appealed.

The Superior Court affirmed the judgment of sentence. Pertinently, the panel upheld the trial court's order denying Lewis's motion to suppress the firearm.[4] The panel concluded:

> The initial pre-flight interaction between [Lewis] and the officers constituted a mere encounter, which does not require any level of police suspicion. The officers simply stopped their patrol car and opened the doors after observing what appeared to be gambling on a street corner located in an area known for illicit activities. N.T. [Suppression Hearing], 12/8/21, at 10, 12, 16. The sirens were not on and there was no evidence that the officers even spoke to [Lewis]. *Id.* Once [Lewis] spontaneously fled, the officers had reasonable

---

[4] The panel also upheld the trial court's order denying Lewis's motion to exclude DNA evidence linking Lewis to the firearm. We declined allowance of appeal as to that issue. Thus, we do not discuss it further.

suspicion that criminal activity was afoot. The officers testified that the area where the stop occurred is "known for narcotic sales, gambling . . . [and] a lot of carjacking" and "well known for the high-crime rate." *Id.* at 11, 20. [Lewis]'s unprovoked flight, combined with the high crime area and the officer's observation of purported gambling, supported reasonable suspicion justifying an investigatory detention.

Given that police were lawfully pursuing [Lewis], his abandonment of the bag was not a 'forced abandonment' that would require suppression of the evidence.

*Commonwealth v. Lewis*, 303 A.3d 788, 2023 WL 4842305, at *3 (Pa. Super. 2024) (unpublished memorandum).

In a footnote, the panel rejected Lewis's argument that "the officers' testimony was insufficient to establish that the area was known for high crime because the officers lacked experience and had not made any gambling arrests in the area before." *Id.* at *3 n.2. The panel reasoned "it is within the lower court's province 'to pass on the credibility of witnesses and determine the weight to be given to their testimony.'" *Id.*, *quoting Commonwealth v. Clemens*, 66 A.3d 373, 379 (Pa. Super. 2013). Therefore, the panel deferred to the trial court's finding "that the testimony of the officers regarding the level of crime in the area was credible." *Id.*

We granted discretionary review, limited to the following rephrased questions:

1. Was the evidence sufficient to establish a high crime area, which, in addition to [Lewis]'s flight upon observing the arrival of police officers, provided the basis for the Superior Court's determination that the police possessed reasonable suspicion for a seizure that occurred when the police pursued [Lewis]?

2. Did the Superior Court err in concluding that [Lewis]'s abandonment of the bag from which a firearm was recovered was not coerced by illegal police action, thereby requiring suppression of the firearm?

*Commonwealth v. Lewis*, 316 A.3d 984 (Pa. 2024) (*per curiam*).

## II. Discussion

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported

by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Saunders*, 326 A.3d 888, 894 (Pa. 2024) (brackets omitted), *quoting Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017). "Where the record supports the suppression court's factual findings, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Id.*, *quoting Commonwealth v. Dunkins*, 263 A.3d 247, 252 (Pa. 2021). "Our scope of review is limited to the record of the suppression hearing." *Id.* at 895. If the Commonwealth prevailed at the suppression hearing, we "consider only the Commonwealth's evidence and so much of the defense's evidence as remains uncontradicted when read in the context of the record as a whole." *Dunkins*, 263 A.3d at 252, *quoting In Interest of A.A.*, 195 A.3d 896, 901 (Pa. 2018).

## A. High-Crime Area

### 1. Arguments

Lewis first claims the Commonwealth failed to prove he was in a high-crime area when he fled. Lewis believes courts should approach high-crime area designations with more caution, "considering [their] potential for abuse, dubious utility for predicting crime, and role in perpetuating systemic inequality in the criminal justice system." Lewis's Brief at 16. As a remedy, Lewis proposes that we adopt and impose on the Commonwealth a new, four-prong admissibility test. In order to designate a location as a "high-crime area," Lewis's test would require the Commonwealth to: "(1) present evidence using verifiable crime data and statistics, (2) define the area's parameters in geographic scope, (3) establish the data's temporal relevance, [and] (4) draw a logical connection between the type of criminality for which the area is known" and the type of crime suspected on the day of the stop. *Id.* at 18. Only if the Commonwealth "satisfies all four prongs" could a suppression court consider the area high in crime and decide "how much weight, if any, to afford" that factor. *Id.*; *see id.* at 21-22 ("At a minimum, the [Commonwealth] must be

required at a suppression hearing to prove the factor's applicability and appropriate weight by satisfying four threshold elements: (1) verifiable crime data and statistics, (2) geographic scope, (3) temporal relevance, and (4) crime type overlap.").

Under Lewis's test, a police officer's testimony about his or her subjective experiences, on its own, would never be sufficient to deem an area high in crime, "regardless of whether an officer testifies credibly[.]" *Id.* at 28. According to Lewis, police officers are generally "uninformed about which areas in their jurisdictions have elevated crime rates." *Id.* at 30. He claims officers "misclassify" areas as high in crime either to justify investigatory stops after the fact, "or because their professional focus on crime . . . cause[s] them to perceive more disorder than an objective view of the circumstances would warrant." *Id.* at 21, *quoting* Adam Carlis, *The Illegality of Vertical Patrols*, 109 COLUM. L. REV. 2002, 2010-11 (2009). To avoid this problem, Lewis believes the Commonwealth should be required to present verifiable data or statistics demonstrating "the neighborhood in question experiences higher crime levels than others," and "the deviation is sufficiently pronounced such that it supports reasonable suspicion[.]" *Id.* at 35. Requiring statistics would not be burdensome for the Commonwealth, Lewis asserts, because "[s]tatistics about crime frequency, type, and location are increasingly available to police departments and prosecutor's offices." *Id.* at 29.[5]

---

[5] Lewis suggests an "acceptable substitute might be police department[s] certifying an area with the 'high-crime' designation, assuming that 1) the officer relying on the 'high-crime area' factor in a particular case was aware at the relevant moment of his department's designation, and 2) the department arrived at the 'high-crime area' designation via objective, fair and reasonable systems for collecting, calculating and applying empirical evidence[.]" Lewis's Brief at 33 (footnote omitted). Alternatively, Lewis says the Commonwealth "need not present underlying statistics at suppression proceedings so long as it shared its data and methodology with the defense reasonably in advance." *Id.* at 34 (footnote omitted). If the defense challenges the "high-crime area" designation, then, according to Lewis, the Commonwealth would have to decide "on a case-by-case basis" whether to "enter[] its supporting data into the suppression record[.]" *Id.* at 35.

The remaining three prongs of Lewis's test would require the Commonwealth to limit its data geographically, temporally, and by crime-type. For instance, Lewis argues an officer designating "a specific corner as 'high-crime' might carry greater weight than if he ascribes the same characterization to an entire neighborhood or city." *Id.* at 37. Similarly, "[e]vidence that police made 20 drug arrests the day before" the stop would carry more weight than evidence "police previously made 200 drug arrests in the area — but none in the past five years[.]" *Id.* at 41. Finally, an officer's suspicions of graffiti would carry more weight in "a neighborhood where there is a significant and disproportionate graffiti problem" than in a neighborhood known for an unrelated crime. *Id.* at 45, *quoting Commonwealth v. Jackson*, 302 A.3d 737, 760-61 (Pa. 2023) (opinion in support of reversal) (Donohue, J.).

Lewis claims the evidence presented in this case failed to meet his four-prong test. In his view, "[r]ather than present specific, empirical data" on crime in the area, the Commonwealth "relied on the vague war stories of two police officers." *Id.* at 18-19. Moreover, he asserts the officers' testimony was "not limited to a specific geographic area, . . . concerned crimes unrelated to gambling, and . . . had no time-based limitation." *Id.* at 19. Having failed to meet any of the prongs of his test, much less all of them, Lewis thus concludes the lower courts erred in treating the scene of the stop as a high-crime area.

The Defender Association of Philadelphia (Defender Association), as *amicus curiae*, takes a different approach. Despite acknowledging the issue "would likely be outside" the scope of this appeal, it urges us to "eliminate the 'high-crime area' factor altogether from Pennsylvania's search and seizure framework." *Amicus* Defender Association's Brief at 5-6. The Defender Association claims the term "high-crime area" is merely a "euphemism for a neighborhood's racial composition[,]" so courts' "continued

endorsement" of that term "perpetuates racial discrimination in Pennsylvania's criminal justice system" and "creates a vast inequality in the level of privacy afforded individuals based on where they find themselves." *Id.* at 4-5, 14, *quoting Jackson*, 302 A.3d at 756 (opinion in support of reversal) (Donohue, J.). The Defender Association argues Black Americans have historically been "segregate[d] . . . into poorer, urban areas" as a result of "[i]nstitutionalized discrimination[,]" and "[t]he public then stigmatized these communities as unruly and dangerous, generating public support for heavy-handed law enforcement activity there." *Id.* at 6. In its view, these high-crime area designations are "self-perpetuating[.]" *Id.* at 19 (citation omitted). "Disproportionate allocation of police resources in Black and Hispanic neighborhoods naturally yields higher arrest rates of Black and Hispanic people[,]" and officers then "cite swelling arrest rates to label these neighborhood's 'high-crime[.]'" *Id.* at 18. The Defender Association therefore encourages us to "outlaw reliance on the 'high-crime area' factor as condemnation of the inequity and bias that persists in our institutions." *Id.* at 21.[6]

In response, the Commonwealth acknowledges it bears the burden of proving a "high-crime area" is, in fact, high in crime. Commonwealth's Brief at 18. The Commonwealth also agrees "statistics, location, time, and a logical connection between the crime and the area's criminality **may** be relevant factors in a trial court's assessment of whether an area is high in crime for purposes of the reasonable suspicion analysis." *Id.* at 29 (emphasis in original). "Where the parties depart[,]" according to the Commonwealth, "is the wisdom of superimposing an artificial and strict elements-based test onto [the] inherently flexible standard" of reasonable suspicion. *Id.* at 18. The

---

[6] Separately, the Defender Association asks us to reevaluate mere encounters, arguing "reasonable people hardly ever feel free to ignore an armed and uniformed police officer when he approaches them in public." *Amicus* Defender Association's Brief at 33. This argument, like the Defender Association's principal argument, is outside the scope of this appeal. Consequently, we address neither.

Commonwealth argues reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 18-19, *quoting Ornelas v. United States*, 517 U.S. 690, 695-96 (1996). Since "no by-the-numbers, elements-based test can sufficiently cover every factual scenario" police officers in the field will encounter, the Commonwealth urges us to trust suppression courts to weigh the evidence "without a conceptual straitjacket." *Id.* at 17-18, 27.

The Commonwealth takes particular issue with mandating data or statistics. In the Commonwealth's view, assuming a "lack of gambling **arrests** in an area means a lack of gambling in the area" is a logical fallacy. *Id.* at 22 (emphasis in original). The Commonwealth also fears requiring statistics would make it "practically impossible for the police to consider, on the street in real time, whether suspected criminality occurred" in a high-crime area. *Id.* at 22. It quips that an "officer would need a compass, population density map, and crime rate statistics," as well as "the time to re-draw geographic boundaries" every time the officer sought to conduct an investigatory stop. *Id.* at 24. Plus, the Commonwealth continues, the officer would need to determine "in real time" if "a sufficient number of relevant arrests were made in the area in an undefined 'range of dates[,]" *id.* at 25, and need to select another area for a comparison, which raises more questions: "Is it one that has a similar population density? A similar socioeconomic makeup? A similar geographic layout?" *Id.* The Commonwealth also believes Lewis's insistence on data places form over function. For example, in the Commonwealth's view, there is no meaningful difference between it presenting data on 20 arrests made the day before the stop and an officer simply testifying about his or her knowledge of those 20 arrests. *Id.*

Alternatively, the Commonwealth claims it would be unreasonable to hold it "did not retroactively satisfy all four elements of [Lewis's] custom-made test[.]" *Id.* at 17. Here,

the officers saw Lewis "standing in a group of men in a manner indicative of street gambling[.]" *Id.* at 16. The trial court credited the officers' testimony that "the area of 1200 West Dauphin Street in Philadelphia is known for gambling." *Id.* at 13. Officer Whatley testified that he was "assigned to that sector almost on a daily basis" and "very frequently" observed people gambling. *Id.* at 14, *quoting* N.T. Suppression Hearing, 12/8/21, at 11-12. The Commonwealth argues this record evidence "supports the trial court's finding that [Lewis's] flight from police occurred in a high-crime area." *Id.* at 16.

The Office of the Attorney General (OAG), as *amicus curiae*, adopts a similar stance. The OAG asserts there is no need to ascribe "a specific legal definition" to high-crime areas "because **no** factors in the totality of the circumstances analysis are specifically defined." *Amicus* OAG's Brief at 19 (emphasis in original). Along those lines, the OAG notes the totality of the circumstances test "rejects rigid formulas and pseudo-scientific precision in favor of commonsense judgments and inferences about human behavior." *Id.* at 6. In the OAG's view, Lewis's "real complaint" is not some "shortcoming in the totality of the circumstances test" this Court needs to correct, but Lewis's perception that "Common Pleas judges are dazzled or confused by buzz words and vague testimony lacking in relevance." *Id.* at 17-18. The OAG believes judges are capable of evaluating police testimony without a test and emphasizes cross-examination remains available to expose any testimony that is "false, exaggerated, and conclusory[.]" *Id.* at 18.

The OAG also resists any argument that "this Court should completely bar consideration of 'high crime areas' from the totality of the circumstances analysis." *Id.* at 13. It claims "people who live in poor areas riddled with crime are in greater need of police protection, which requires police familiarity with local conditions and the ability to act upon such information where appropriate." *Id.* at 15. Thus, as the OAG sees it, requiring the police to ignore "highly relevant" facts about their surroundings "would in fact

do a disservice to the honest citizen residing in a high-crime area." *Id.* at 13, *quoting* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2 Search & Seizure §3.6(g) (6th ed. 2024).

In reply, Lewis reiterates his belief in the need for empirical data and claims he is merely asking the Commonwealth to present data it already possesses. In particular, he notes the Commonwealth already presents "crime frequency data at suppression hearings" involving DUI checkpoints. Lewis's Reply Brief at 10. Lewis also remarks that assigning weight to high-crime areas creates "two tiers of constitutional rights in Pennsylvania: one for those who cannot afford to move out of 'high-crime areas' and another for those with the means to do so." *Id.* at 27. However, he acknowledges "[w]hether such an approach is wise is not an issue here" since his challenge implicates only the standards of proof. *Id.* Finally, Lewis disputes that his flight was suspicious. He claims his "flight from police might just as likely have been explained by a fear that he was about to be subjected to an unreasonable seizure as by any consciousness of guilt." *Id.* at 28.

## 2. Analysis

"The Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures." *Saunders*, 326 A.3d at 896 (brackets omitted), *quoting Commonwealth v. Jones-Williams*, 279 A.3d 508, 515 (Pa. 2022). But not every interaction between citizens and the police constitutes a seizure. "There are three relevant cognizable categories of interactions between persons and police: a mere encounter, an investigative detention, and a

custodial detention or arrest." *Commonwealth v. Chase*, 960 A.2d 108, 117 (Pa. 2008). Only the first two are implicated in this case.[7]

A mere encounter "requires no particular suspicion of criminality because it carries 'no official compulsion to stop or to respond.'" *Commonwealth v. Hicks*, 208 A.3d 916, 927 (Pa. 2019), *quoting Commonwealth v. Ellis*, 662 A.2d 1043, 1047 (Pa. 1995). However, it escalates to an investigatory stop if "a reasonable person would have believed that he was not free to leave." *Commonwealth v. Livingstone*, 174 A.3d 609, 619 (Pa. 2017), *quoting United States v. Mendenhall*, 446 U.S. 544, 554 (1980).[8] When that happens, for the stop to be proper the police must have a reasonable suspicion, based upon specific and articulable facts, that criminal activity is afoot. *Commonwealth v. Adams*, 205 A.3d 1195, 1205 (Pa. 2019). We will examine this standard more closely later. For now, what's important is that a proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop and "afford[s] due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.]" *Interest of T.W.*, 261 A.3d 409, 423 (Pa. 2021); *see also United States v. Arvizu*, 534 U.S.

---

[7] The Superior Court concluded "[t]he initial pre-flight interaction between [Lewis] and the officers constituted a mere encounter, which does not require any level of police suspicion." *Commonwealth v. Lewis*, 303 A.3d 788, 2023 WL 4842305, at *3 (Pa. Super. 2024) (unpublished memorandum). Since Lewis does not ask us to revisit the Superior Court's conclusion, *see* Lewis's Brief at 47 n.9 ("this Court need not decide whether Mr. Lewis was seized before the chase began"), we will not address it further.

[8] This standard is, in some sense, a misnomer. Few people when approached by a uniformed police officer would feel completely free to "walk away or refuse to answer." *Commonwealth v. Mathis*, 173 A.3d 699, 713 (Pa. 2017), *quoting* Wayne R. LaFave, 4 Search & Seizure §9.4(a) (5th ed. 2016). "Rather, the confrontation is a seizure only if the officer adds to those inherent pressures by engaging in conduct significantly beyond that accepted in social intercourse." *Id.*; *see also Livingstone*, 174 A.3d at 621 (factors that may suggest a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

266, 273 (2002) (reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotations omitted). "[T]he totality of circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *In Interest of A.A.*, 195 A.3d 896, 904 (Pa. 2018) (cleaned up), *quoting Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004). *Per se* rules are incompatible with a totality-of-the-circumstances inquiry. *See Hicks*, 208 A.3d at 939 (recognizing the "danger of *per se* rules, pursuant to which the totality of the circumstances inquiry — the whole picture — is subordinated to the identification of one, single fact").

Importantly, although "federal and Pennsylvania constitutional law diverge on the question of what constitutes an investigative stop," *compare Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment.") *with Commonwealth v. Matos*, 672 A.2d 769, 776 (Pa. 1996) (rejecting this rule "as incompatible with the privacy rights guaranteed to the citizens of this Commonwealth under Article I, Section 8 of the Pennsylvania Constitution"), for decades this Court has held "they are coextensive regarding the quantum and nature of evidence required for a stop[.]" *Jackson*, 302 A.3d at 762 n.2 (opinion in support of reversal) (Dougherty, J.), *citing Commonwealth v. Grahame*, 7 A.3d 810, 816 (Pa. 2010) ("Pennsylvania courts have always followed [*Terry v. Ohio*, 392 U.S. 1, (1968)] regardless of whether the appellant's claim was predicated on the Fourth Amendment or Article I, Section 8 of the Pennsylvania Constitution."), *In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001) ("Pennsylvania courts have consistently followed *Terry* in

stop and frisk cases, including those in which the appellants allege protections pursuant to Article 1, Section 8 of the Pennsylvania Constitution."), *Commonwealth v. Wimbush*, 750 A.2d 807, 810 n.2 (Pa. 2000) ("We note that Pennsylvania has consistently followed Fourth Amendment jurisprudence in stop and frisk cases."), and *Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997) ("Pennsylvania has always followed *Terry* in stop and frisk cases[.]"). Also relevant here, this Court has long recognized a suspect's presence in a high-crime area as a relevant factor in assessing reasonable suspicion. *See, e.g.*, *Interest of T.W.*, 261 A.3d at 424 n.5 ("presence in a high crime area may be considered in examining the totality of the circumstances"); *Hicks*, 208 A.3d at 938 ("Relevant contextual considerations may include factors such as a suspect's presence in a high crime area."); *Commonwealth v. Cook*, 735 A.2d 673, 677, 677 n.4 (Pa. 1999) (considering evidence Cook was in a "high crime area," where the officer had "made numerous drug related arrests[,]" in concluding the officer had reasonable suspicion).

The seminal case on high-crime areas is *Illinois v. Wardlow*, 528 U.S. 119 (2000). In that case, Wardlow was in "an area known for heavy narcotics trafficking" when he fled from the police. *Id.* at 121. On appeal, the United States Supreme Court acknowledged "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* at 124. But the Court also explained that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* It therefore held "the fact that the stop occurred in a 'high crime area'" was a "relevant contextual consideration[]" in assessing reasonable suspicion in Wardlow's case. *Id.*[9]

---

[9] "Following [*Wardlow*]," this Court has explained, "it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment." *D.M.*, 781 A.2d at 1164. We recently granted review in a (continued…)

At first blush, this principle seems unremarkable. If a proper reasonable suspicion analysis considers the totality of circumstances surrounding the stop, *see Interest of T.W.*, 261 A.3d at 423, then, logically, this might include the location of the stop in some cases. After all, we have recognized that prudent police officers on patrol "pay close attention to every detail of their surroundings" and take their knowledge of the area into account when considering a stop. *Commonwealth v. Thompson*, 985 A.2d 928, 936 n.10 (Pa. 2009). Thus, for example, an officer observing a hand-to-hand transaction on a street corner will naturally be more suspicious if he knows the corner is a hotspot for heroin sales than if the corner has no meaningful history of drug trafficking. *See Commonwealth v. E.M.*, 735 A.2d 654, 659-60 (Pa. 1999) (presence in a "high crime area, in which [the officer] had previously made several drug-related arrests," supported the officer's suspicion a transaction was "drug-related"); *see also* LaFave, *supra*, §3.6(g) (6th ed. 2024) ("If a person is seen carrying a valuable piece of personal property, such as television or stereo

---

separate case to consider whether it "violate[s] Article I, Section 8 [of the Pennsylvania Constitution] to hold that there is reasonable suspicion based solely on the location of the flight in a 'high crime area[.]'" *Commonwealth v. Shivers*, 322 A.3d 879 (Pa. 2024) (*per curiam*). Because Lewis raises no such claim in this discretionary appeal (and raised no such claim at any point below), it is waived, and we therefore "follow[ ] Fourth Amendment jurisprudence[.]" *Wimbush*, 750 A.2d at 810 n.2; *see Commonwealth v. Bishop*, 217 A.3d 833, 841 (Pa. 2019) (explaining this Court "treats parallel federal and state constitutional provisions as coterminous where the appellant has done nothing to distinguish between them"). For the same reason, we respectfully decline to address the partial dissent's view that we should "abandon this aspect of federal law and correct the course that we chart under our own Constitution." Concurring and Dissenting Opinion at 2 (Wecht, J.). An appellate court — including this Court, when acting in that capacity, as we are in this appeal by allowance involving pure Fourth Amendment issues — is not empowered to simply decide whatever legal issues it pleases, regardless of preservation or advocacy. Our longstanding precedent mandates judicial restraint in this context, not a judicial "free-for-all." *Id.* at 254; *see Gibraltar Rock, Inc. v. Dep't of Env't Prot.*, 286 A.3d 713, 725 (Pa. 2022) (an appellate court "exceed[s] its authority when it sua sponte addresse[s]" a constitutional issue that was "never preserved or raised on appeal"); *Francis v. Neville Twp.*, 92 A.2d 892, 894 (Pa. 1952) ("An appellate court . . . can only pass upon the legal question involved in any case which comes before it[.]").

equipment, under suspicious circumstances, the officer cannot be expected to disregard the fact that this is occurring in a neighborhood with a high incidence of burglaries"). It would be "simply illogical" to expect officers "to ignore those details, or to conclude that an officer's experience regarding them is not a 'relevant factor' informing" reasonable suspicion. *Thompson*, 985 A.2d at 936 n.10.

As several Justices on this Court have astutely observed, however, the "high-crime area" label has been overused. *See Commonwealth v. Dobson*, 307 A.3d 612 (Pa. 2024) (opinion in support of reversal) (Wecht, J.); *Commonwealth v. Jackson*, 302 A.3d 737 (Pa. 2023) (opinion in support of reversal) (Donohue, J.); *Thompson*, 985 A.2d at 928 (Baer, J., dissenting); *id.* (Todd, J., dissenting). Our decision in *Commonwealth v. Barr*, 266 A.3d 25 (Pa. 2021), offers an example. There, the police stopped Barr's car "for a minor traffic violation and then smelled marijuana upon approaching the vehicle[.]" *Id.* at 44. In that context, we held "the characteristics of the neighborhood where the troopers stopped the vehicle [we]re legally irrelevant to whether the troopers had probable cause to search the vehicle." *Id.*; *see id.* ("it is of no moment whether the area in which the stop occurred is known as a 'high crime area'"). We so held because the only suspected criminal activity in that case revolved around the presence of the odor of marijuana, which smells the same in high-crime areas as it does in low-crime areas. Under those circumstances, the fact that the area where the stop occurred was generally high in crime would have added nothing probative to the legal determination of whether the police had probable cause to search the vehicle.

Our *per curiam* decision in *Jackson* is also instructive. There, an officer on routine patrol in Philadelphia heard multiple gunshots and, soon after, saw Jackson running away. *See Jackson*, 302 A.3d at 738 (opinion in support of affirmance) (Brobson, J.). The officer "asked Jackson why he was running, and Jackson responded that he was

running 'from the gunshots.'" *Id.* (citation omitted). We granted review to consider whether this investigative detention was supported by reasonable suspicion. Although we evenly divided on the issue, relevant here, in her opinion in support of reversal, Justice Donohue aptly noted "[a] person in an area known for gun violence is at least as likely to run away from the sound of gun shots as a person in an area not known for gun violence." *Jackson*, 302 A.3d at 761 (opinion in support of reversal) (Donohue, J.). In other words, just as in *Barr*, the officer designating the block a high-crime area would have added nothing of legal significance under the facts presented in *Jackson*.

With these recent examples in mind, we cannot deny that, over time, "general designations of neighborhoods as 'high crime' areas seems to have become a box-checking heuristic for law enforcement in search-and-seizure cases." *Commonwealth v. Galloway*, 284 A.3d 870, 875 (Pa. 2022) (Wecht, J., dissenting). Some officers tend to intone the mantra "high-crime area" simply as a matter of routine, seemingly motivated by the knowledge that the term has occasionally "tip[ped] the scales toward reasonable suspicion[.]" *Jackson*, 302 A.3d at 762 (opinion in support of reversal) (Donohue, J.); *compare Cook*, 735 A.2d at 677 ("flight alone does not constitute reasonable suspicion") (citation omitted), *with In re D.M.*, 781 A.2d at 1164 ("unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop"); *see* LaFave, *supra*, §9.5(g) ("[I]t is quite common in a variety of circumstances for police to try to leverage up to reasonable suspicion some other suspicious conduct by stating it occurred in a high crime area, often without any elaboration or explanation."). The question is how do we rectify this apparent problem?

As detailed above, Lewis believes the answer lies in a rigid, four-prong test the Commonwealth must meet before a suppression court may consider a high-crime area designation as part of its totality-of-the-circumstances calculus. If the Commonwealth

fails to satisfy a single prong, then Lewis's proposed test would preclude the suppression court from considering the officer's knowledge of the relevant characteristics of the area, regardless of credibility.

Perhaps unsurprisingly, Lewis fails to identify a single case, binding or otherwise, in which a court has embraced his proposed test. And the single citation he provides — with no discussion — actually undermines his claim. *See* Lewis's Brief at 22, *citing United States v. Wright*, 485 F.3d 45 (1st Cir. 2007). In *Wright*, the First Circuit Court of Appeals held the question of whether the scene of a stop was a high-crime area is a "factual issue" for the suppression court to resolve. 485 F.3d at 53. "In most cases," the First Circuit explained, "the relevant evidence for this factual finding will include **some combination** of the following: (1) the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case, . . . (2) limited geographic boundaries of the 'area' or 'neighborhood' being evaluated, . . . and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop[.]" *Id.* at 53-54 (emphasis added). The First Circuit also noted "[e]vidence on these issues **could** include a mix of objective data and the testimony of police officers, describing their experiences in the area." *Id.* at 54 (emphasis added). As the bolded language above plainly reflects, the *Wright* court did not impose any mandatory or rigid requirements on the factfinder when assessing whether an area is high in crime. In fact, *Wright* is materially identical to the position the Commonwealth advocates in this case. That is, the Commonwealth agrees "statistics, location, time, and a logical connection between the crime and the area's criminality **may** be relevant factors in a trial court's assessment of whether an area is high in crime[.]" Commonwealth's Brief at 29. It simply urges that suppression courts "must be permitted to weigh these factors" without the strictures of a multi-prong test. *Id.*

Reasonable suspicion, like probable cause, is an inherently "fluid" concept. *Ornelas*, 517 U.S. at 696. It "deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at 695*, quoting Illinois v. Gates*, 462 U.S. 213, 231 (1983). "As such," reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 695-96. Indeed, the High Court has consistently rejected "rigid rules, bright-line tests, and mechanistic inquiries" in this context "in favor of a more flexible, all-things-considered approach." *Florida v. Harris*, 568 U.S. 237, 244 (2013); *see also Arvizu*, 534 U.S. at 274 ("[T]he concept of reasonable suspicion is somewhat abstract. . . . But we have deliberately avoided reducing it to 'a neat set of legal rules[.]'"), *quoting Ornelas*, 517 U.S. at 695-66; *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989) (critiquing the Ninth Circuit Court of Appeals' effort "to refine and elaborate the requirements of 'reasonable suspicion'" for "creat[ing] unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment").

The Supreme Court expounded on this point in *Gates*. There, the Court reviewed a "two-pronged test" requiring anonymous tips to: (1) reveal the basis of an informant's knowledge; and (2) "provide facts sufficiently establishing either the 'veracity'" of the informant "or, alternatively, the 'reliability' of the informant's report[.]" *Gates,* 462 U.S. at 228-29. While the Court agreed those factors were "all highly relevant in determining the value" of an anonymous tip, *id.* at 230, it rejected the imposition of a rigid, two-prong test. *See id.* at 234 ("the 'two-pronged test' has encouraged an excessively technical dissection of informants' tips"). The Court explained anonymous tips "come in many shapes and sizes from many different types of persons" and that "[r]igid legal rules are ill-suited to an area of such diversity." *Id.* at 232. Moving forward, the High Court instructed that "the informant's 'veracity' or 'reliability' and his 'basis of knowledge'" should be

construed "as relevant considerations in the totality-of-the circumstances analysis" rather than "independent requirements to be rigidly exacted in every case." *Id.* at 230, 233. The Court elaborated that this means

> a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability. If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip.

*Id.* at 233 (citations omitted).

It is hard to reconcile Lewis's strict, four-prong test with the Fourth Amendment principles espoused in *Gates*, for several reasons. First, high-crime areas, too, "come in many shapes and sizes[.]" *Id.* at 232. Forcing a rigid, multi-prong framework onto that fluid concept raises more questions than it answers. Consider, for instance, Lewis's second prong. There, he claims the Commonwealth should be required to "define the area's parameters in geographic scope" before the suppression court can "consider the 'high-crime area' factor[.]" Lewis's Brief at 18. But how narrowly must the Commonwealth define the scope in order to check off that prong? A single neighborhood? A five-block zone? A single corner? Lewis himself offers little guidance. He envisions the Commonwealth drawing a "radius" on a map, "using the defendant's arrest location as the center." *Id.* at 39 (citation omitted). Yet even he seems to concede the proper size of the radius cannot be easily defined. *See id.* ("In theory, if an area is heavily populated, the police will then need less in the way of statistical evidence to prove it is high in crime. The smaller the radius, the more reliable the result would be because the result is more specific to the defendant . . .") (citation omitted); *see also id.* (recognizing "reasonable suspicion analysis is not conducive to bright-line rules").

In exchange for those strict-yet-hazily-defined guardrails, Lewis's test would sacrifice suppression courts' ability as factfinder to consider and weigh the evidence. As the Commonwealth observes, a longstanding and important "[p]art of that weighing involves determining if the absence of evidence of one factor is made up by the strength of another — a possibility foreclosed by [Lewis]'s strict elements-based test." Commonwealth's Brief at 29. If, for example, an officer credibly testifies he made over 200 arrests for selling heroin on a single corner, then his failure to date those arrests would ordinarily go to the weight of his testimony, not its relevancy. And yet, Lewis's test would preclude the suppression court from considering the officer's knowledge of the area entirely, simply because the officer failed to check off one box of an artificial test.

Lewis's insistence on statistics is particularly problematic. Reasonable suspicion is not applied only by judges and lawyers in the unhurried forum of a courtroom. It is applied first and foremost in real time by police officers in the field. And therein lies the problem. While it may be true that crime data is increasingly available to police departments and district attorney's offices,[10] that does not mean officers on the scene have access to such data on a moment's notice, and certainly not at the level of minutiae that Lewis's proposed test demands. To insist on such evidence would thereby risk "underestimat[ing] the usefulness of the reasonable-suspicion standard in guiding officers in the field." *Arvizu*, 534 U.S. at 275.

Consider Lewis's case as an example. The officers saw a group of men who "appeared to be gambling" in an area "known" for gambling. N.T. Suppression Hearing, 12/8/21, at 9. Under Lewis's test, the officers could only take their knowledge of the area

---

[10] *See, e.g.*, Philadelphia Police Department, *Crime Data*, available at www.phillypolice.com/crime-data/crime-statistics/ (last visited Sept. 19, 2025); Philadelphia District Attorney's Office, *Public Data Dashboard*, available at https://data.philadao.com (last visited Sept. 19, 2025).

into account if they had data proving there had been recent arrests for gambling in the area, the arrests were localized to a small area around 1200 West Dauphin Street, and the rate of gambling was high compared to another, similarly situated area, which the officers presumably would have to choose on the scene. Of course, by the time the officers compiled this data and assessed it along with any other factors rousing their suspicion, the gamblers would be long gone. Or, more realistically, the officers would simply skip the cumbersome data analysis and pursue the gamblers regardless, knowing their knowledge of the area, however relevant, might ultimately be disallowed or ignored at a future suppression hearing. Accordingly, we agree with the Commonwealth that Lewis's proposed test "makes it practically impossible for the police to consider, on the street in real time, whether suspected criminality occurred in an area they know to be high in crime." Commonwealth's Brief at 22; *see also* LaFave, *supra*, §3.6(g) (although concerns about designating areas as "high-crime" are "legitimate . . ., it is to be doubted that the answer lies in requiring police to disregard their knowledge of the nature and degree of criminal conduct occurring in particular areas").[11]

Moreover, mandating crime data assumes a high incidence of crime necessarily translates to a high incidence of arrests. But that is not always the case. Many, if not most, crimes go unreported or do not result in the apprehension of a suspect.

---

[11] That the Commonwealth may be able to readily compile the data after the fact is beside the point. A proper reasonable suspicion analysis considers only "the facts available to the officer at the moment of the intrusion," *Commonwealth v. Zhahir*, 751 A.2d 1153, 1156 (Pa. 2000) (brackets omitted), *quoting Terry*, 392 U.S. at 21-22, not statistics a prosecutor later assembles to justify the officer's earlier actions. So, for instance, if the Commonwealth introduced evidence of 20 gambling arrests on the corner of 1200 West Dauphin Street from the week preceding the stop, unless the Commonwealth could also prove one of the officers was aware of those arrests at the time of the stop, the evidence would be irrelevant. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.").

Additionally, law enforcement in some jurisdictions choose to employ means other than arrest for certain low-level offenses. The Commonwealth points out, for example, that in 2018 "the Philadelphia District Attorney announced a policy to decline charges for most people accused of prostitution." Commonwealth's Brief at 23 n.10 (citation omitted). Since then, prostitution arrests have significantly declined in Philadelphia, from 252 in 2017 to 29 in 2024. *See* Philadelphia District Attorney's Office, *Public Data Dashboard*: *Arrests*, available at https://data.philadao.com/Arrest_Report.html (last visited Sept. 19, 2025). Of course, that does not mean the incidence of prostitution in Philadelphia has necessarily declined, much less declined at the same rate as prostitution arrests.

For his part, Lewis claims "[t]his Court's decisions in the DUI checkpoint space have required the Commonwealth to present crime frequency data at suppression hearings for decades, and neither the Commonwealth nor police officers nor trial judges have found this requirement impossible to implement." Lewis's Reply Brief at 10. But the comparison is inapt. Unlike investigatory stops, DUI checkpoints are arranged in advance. "The site of the roadblock and the time of its operation" are predetermined by police departments "based on empirical data indicating that drunk drivers pose a particular problem at the respective location and time." *Commonwealth v. Tarbert*, 535 A.2d 1035, 1041 (Pa. 1987) (plurality) (citation omitted). In that unhurried context, presenting data is eminently reasonable, as the Commonwealth is effectively just presenting the facts the police used to decide when and where a checkpoint would be set up. Investigatory stops, on the other hand, are not arranged in advance; they often unfold quickly and unexpectedly, making it difficult if not impossible for officers to take nuanced statistics into account. Because mandating historical crime data in this context would be novel and incompatible with the realities of street-level policing, we decline Lewis's invitation to do so.

Nevertheless, although we decline to impose a statistics requirement or adopt a strict test that must be satisfied before suppression courts may consider the relevant characteristics of an area when conducting a reasonable suspicion analysis, one point cannot be overstated: merely intoning the words "high-crime area" is never sufficient to prove an area is, in fact, high in crime. *See generally T.W.*, 261 A.3d at 438 (Dougherty, J., concurring) (cautioning officers testifying at suppression hearings to "not rely on broad generalities, or assume certain 'magic words' will satisfy the reasonable suspicion standard"). The Commonwealth bears the burden of proving a high-crime area is, in fact, high in crime, *see* Pa.R.Crim.P. 581(H) ("The Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights."), and the suppression court is free to discredit the Commonwealth's evidence when appropriate, *see Commonwealth v. Poplawski*, 130 A.3d 697, 711 (Pa. 2015) (it is within the "sole province" of the suppression court "to pass on the credibility of witnesses and the weight to be given their testimony").

In that vein, we agree in broad strokes with Lewis that certain evidence may be especially helpful to suppression courts in determining whether an area is high in crime. *See Wright*, 485 F.3d at 53-54 (recognizing that, "[i]n most cases, the relevant evidence for this factual finding will include some combination of the following: (1) the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case, . . . (2) limited geographic boundaries of the 'area' or 'neighborhood' being evaluated, . . . and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop"). Thus, we hold that when assessing whether an area is high in crime, a suppression court may consider a variety of factors, including, but not limited to: the geographic scope of the high-crime area; the nexus

between the type of crime the area is known for and the type of crime suspected on the day of the stop; the officer's level of familiarity with the area; the recency of the officer's information; empirical data known to the officer; and the assignment of specialized police units targeting high-crime areas. *See Thompson*, 985 A.2d at 936 n.10 (considering the designation of the area as an "Operation Safe Streets neighborhood[,]" which meant "the Philadelphia Police Department had reached the conclusion, independent of any one officer's personal 'opinion' or 'perspective,' that the neighborhood was a dangerous one"); *Commonwealth v. Rice*, 304 A.3d 1255, 1262 (Pa. Super. 2023) (considering evidence that the officer was "working overtime [on the day of the stop] because additional police presence was needed in the area"). However, these factors are discretionary, not mandatory, and it is ultimately up to suppression courts to determine if the Commonwealth has met its burden of proof.[12]

Finally, if the suppression court is satisfied the Commonwealth has introduced sufficient credible evidence implicating the area is high in crime, the court must then determine in its sole discretion what weight to assign to this factor. *See Commonwealth v. Hughes*, 555 A.2d 1264, 1273 (Pa. 1989) (suppression courts have "the prerogative to believe none, all, or part of the testimony, and this fact-finding function include[s] the duty of determining the weight . . . of such testimony"). By way of example, if an officer limits a high-crime area to a few blocks, then the designation would undoubtedly carry more weight than if his testimony would render all of North Philadelphia a high-crime area. A prudent judge likely would not give such a broad definition much, if any, weight unless other circumstances weigh against the lack of geographic specificity. In any event, we

---

[12] If the defense believes a claimed high-crime area designation is overbroad or outdated, it is free to probe that issue on cross-examination.

believe suppression judges are best suited to make such assessments, and that they are capable of doing so without the constraints of a multi-prong test.[13]

### 3. Application

Here, we conclude the Commonwealth's evidence was sufficient to support the trial court's conclusion that Lewis was in a high-crime area when he fled from the police. *See* N.T. Suppression Hearing, 12/8/21, at 25. Admittedly, if Officer Brush's testimony was the sole evidence in the record, then we would rule differently. Officer Brush testified that the "whole police service area" was "very well known for the high-crime rate we've had[,]" but gave no other relevant specifics. *Id.* at 20.[14] This vague remark is precisely the type of testimony suppression courts should be hesitant to accept.

However, Officer Whatley's testimony was more detailed and relevant. Officer Whatley said the 1200 block of West Dauphin Street was in a "known gambling area" and "a known narcotics area." *Id.* at 9. The high incidence of gambling in the area was particularly relevant to his decision to approach Lewis's group because Officer Whatley

---

[13] The partial dissent curtly remarks that our decision today "achieves nothing" because suppression courts will supposedly "defer to police decision-making, and appellate courts will defer to suppression courts' discretion." Concurring and Dissenting Opinion at 23-26 (Wecht, J.); *see id.* at 25 (predicting "today's decision will make no difference to the outcome of future cases"). Apparently, the partial dissent believes the only "meaningful way" for this Court to achieve just outcomes in future cases is to *sua sponte* adopt a *per se* bar on high-crime-area evidence based on an unraised state constitutional theory. *Id.* at 24. We obviously do not agree. Unlike the partial dissent, we have every confidence suppression and appellate judges alike will carefully heed the clear and detailed guidance provided by this Opinion — which does not remotely call for courts to rubber stamp police testimony regarding high-crime areas — and faithfully apply the law moving forward.

[14] At the suppression hearing, Officer Brush did mention there had been "four or five carjackings within two blocks of that area in the last month." *Id.* at 20. However, even if the police had suspected Lewis of carjacking, this testimony would be irrelevant. Again, a proper reasonable suspicion analysis considers only "the facts available to the officer at the moment of the intrusion[.]" *Zhahir*, 751 A.2d at 1156, *quoting Terry*, 392 U.S. at 21-22. This means the Commonwealth was required prove the area was high-in-crime **at the time of the stop**, not that it became a high-crime area months later, just before the suppression hearing.

suspected the group of gambling. *See id.*; *see also Thompson*, 985 A.2d at 936 (considering evidence a neighborhood was known for "frequent drug trafficking" in assessing whether an officer had reasonable suspicion to investigate a probable drug sale he witnessed); *Commonwealth v. Carter*, 105 A.3d 765, 771 (Pa. Super. 2014) (considering evidence the "street corner [was] known for . . . illegal gun activity" in assessing whether an officer had reasonable suspicion to believe the bulge in Carter's coat was a gun). Officer Whatley explained he was familiar with the area because he had worked in the 22nd Police District for nearly all his three-year career. *See* N.T. Suppression Hearing, 12/8/21, at 11. He was assigned to the section containing 1200 West Dauphin Street "on almost a daily basis[,]" and he observed people gambling "very frequently." *Id.* Thus, Officer Whatley's testimony was based not on uninformed impressions or outdated stereotypes of the neighborhood, but on accumulated knowledge from his almost-daily patrols. When asked to estimate "how many encounters" he had "with people gambling on the street[,]" Officer Whatley responded, "A lot. It's a very common thing in this area." *Id.* at 11-12. The totality of this evidence was sufficient to support the trial court's conclusion that the area had a high incidence of gambling.

That Officer Whatley had not "personally" arrested anyone for gambling "on that specific corner" is not determinative. *Id.* at 14. Although a different suppression judge could have reasonably concluded the lack of arrests undermined the credibility of Officer Whatley's testimony, or determined that less weight should have been afforded to this factor, it is not our role, on appellate review, to substitute our judgment for the trial court's. Instead, our role is limited to determining whether the trial court's factual finding is supported by the record. *See Saunders*, 326 A.3d at 894. In accordance with that limited role, we will not disturb the trial court's factual finding that Lewis was in a high-crime area when he fled.

### B. Abandonment

#### 1. Arguments

Next, Lewis argues the police "coerced him into abandoning [his gun]" by pursuing him without reasonable suspicion. Lewis's Brief at 47 (capitalization omitted). His argument strips down the reasonable suspicion analysis to a single factor: flight. Specifically, he claims the police did not see him personally gambling and failed to prove that the 1200 block of West Dauphin Street was a high-crime area. Since it is well established that flight from the police is, by itself, insufficient to establish reasonable suspicion, *see id.* at 48, *citing Commonwealth v. Jeffries*, 311 A.2d 914, 916-17 (Pa. 1973), Lewis claims his gun should have been suppressed.

The Commonwealth views the record more broadly. It says the police saw Lewis "standing in a group of men in a manner indicative of street gambling," Commonwealth's Brief at 16, and that Officer Whatley saw "money in some of the individual[s'] hands" and "cards in other individual[s'] hands." *Id.* at 31, *quoting* N.T. Suppression Hearing, 12/8/21, at 9. Aware that street gambling was "a very common thing in this area[,]" the officers approached the group. *Id.*, *quoting* N.T. Suppression Hearing, 12/8/21, at 12. But when Officer Brush made eye contact with Lewis, Lewis's "eyes widened and he immediately fled[.]" *Id.* The Commonwealth asserts Lewis's "flight in a high-crime area gave police suspicion to chase him," and that Lewis voluntarily abandoned his gun as he fled. *Id.* at 32.

#### 2. Analysis

"Although abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action." *Commonwealth v. Hall*, 380 A.2d 1238, 1241 (Pa. 1977). Where the police pursue an individual without reasonable suspicion, *see Cook*,

735 A.2d at 675 (recognizing "a police officer's pursuit of a person fleeing the officer [i]s a seizure for purposes of Article I, Section 8 of the Pennsylvania Constitution"), "any contraband discarded during the pursuit is considered a product of coercion and is not admissible against the individual." *Wimbush*, 750 A.2d at 813 n.5. Consequently, the resolution of this issue hinges on whether the police had reasonable suspicion to pursue Lewis when he fled.

The police have reasonable suspicion if they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 589 U.S. 376, 380 (2020), *quoting United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "[A] mere 'hunch' does not create reasonable suspicion[.]" *Id., quoting Prado Navarette v. California*, 572 U.S. 393, 397 (2014). Nevertheless, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* In other words, "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy[.]" *Id.* at 381, *quoting Arvizu*, 534 U.S. at 274. "Courts 'cannot reasonably demand scientific certainty . . . where none exists[,]'" but "[r]ather . . . must permit officers to make 'commonsense judgments and inferences about human behavior.'" *Id.* at 380, *quoting Wardlow*, 528 U.S. at 125.

Flight alone is insufficient to establish reasonable suspicion. *See Cook*, 735 A.2d at 677. "[I]t is a matter of common knowledge that men who are entirely innocent do sometimes" flee from the police out of fear of being wrongfully arrested or "from an unwillingness to appear as witnesses[,]" *Alberty v. United States*, 162 U.S. 499, 511 (1896), a principle that is regrettably just as true now as it was a century ago, *see Mayo v. United States*, 315 A.3d 606, 631 (D.C. Cir. 2024) ("the totality of the circumstances cannot be assessed 'devoid of real world context,' namely the fact that many individuals

'commonly hold a perception that engaging in any manner with police, including in seemingly casual or innocuous ways, entails a degree of risk to one's safety'") (citation omitted). Still, flight, when coupled with other factors, may give the police reasonable suspicion for a stop. *See Wardlow*, 528 U.S. at 124 (where the police saw Wardlow lingering near a building, holding an opaque bag, in "an area known for heavy narcotics trafficking[,]" Wardlow's "unprovoked flight upon noticing the police" gave the police reasonable suspicion to pursue him); *Cook*, 735 A.2d at 677-78, 677 n.4 (where an officer observed an "attempted hand-off of an unidentified object" in an area where he had made "numerous drug related arrests," "appellant's nervous behavior when the police made a U-turn" and subsequent flight from the police "supported a finding of reasonable suspicion").

### 3. Application

The police did not rely solely on flight here; their suspicions were aroused, first and foremost, by the appearance of illegal street gambling. Although Officer Whatley could not recall by the time of the suppression hearing whether he had seen Lewis specifically gambling, *see* N.T. Suppression Hearing, 12/8/21, at 13, he testified some of the men with Lewis had cards in their hands and others were holding money. That the area was known for gambling increased their suspicions.[15] Accordingly, the officers reasonably stopped their car to investigate. However, as soon as Officer Brush opened his car door, Lewis's eyes "got extremely wide" and "he took off running[.]" N.T. Suppression Hearing, 12/8/21, at 16. Given Lewis's evasive behavior, the officer's knowledge of the area as a recurring situs of illegal street gambling, and the evidence of illegal gambling, we hold the

---

[15] Perhaps based on Officer Whatley's candid testimony that he could not recall if he saw Lewis gambling, the Commonwealth does not presently argue, and the suppression court did not find, that the officer's observations of purported violations of Philadelphia City Code §10-612 alone gave rise to reasonable suspicion with respect to Lewis.

trial court correctly determined that the police had reasonable suspicion to pursue Lewis. *See In Interest of S.J.*, 713 A.2d 45, 47-48 (Pa. 1998) (although "[the officer] was unable to specifically identify Appellant as one of the individuals he saw smoking marijuana[,]" the officer's observation of (then-illegal) smoking, "combined with Appellant's suspicious behavior and [the officer]'s knowledge that this was a high crime area known for drug activity, provided him with the requisite reasonable suspicion to conduct an investigatory stop of Appellant").[16]  And since there was reasonable suspicion, we also agree with the trial court's conclusion that Lewis voluntarily abandoned the gun during the pursuit, thereby rendering it admissible for use against him at trial.

### III. Conclusion

In sum, we hold the Commonwealth bears the burden of proving a "high-crime area" is, in fact, high in crime.  However, we decline to impose a mandatory, multi-element test governing the admissibility of such evidence and instead leave it to the discretion of

---

[16] In the dissent's view, it is entirely irrelevant that "Lewis was in a neighborhood where illegal gambling was rampant" and carrying a bag while standing among a group of gamblers because this supposedly does not "make it more probable that Lewis himself was engaged in gambling."  Dissenting Opinion at 7 (Donohue, J.).  Respectfully, this position is untenable.  Although reasonable minds may disagree about how much weight to afford such factors, Lewis's presence within a group of men who were actively gambling — an activity that often involves multiple participants and can encompass passive observation of the result of a wager — in an area that is well known for gambling, is certainly relevant to the determination of whether Lewis himself was also gambling.  *See S.J.*, 713 A.2d at 47-48.  Plus, the Philadelphia City Code prohibits more than just gambling.  It also makes it unlawful for anyone to "set up, establish or conduct a gambling operation[,]" PHILA., PA., CODE §10-612(1) (2024), or to "attempt to gamble" or "incite others to gamble[,]" *id.* at §10-612(2).  Thus, even though police did not see Lewis actively gambling at the precise moment they happened upon the group of illegal gamblers in a known gambling hotspot, Lewis's presence within that group, while holding a bag, was surely relevant to assessing whether he may have set up the illegal operation, may have previously participated in the gambling, was attempting to partake in the ongoing games, or was inciting the others in the group who were observed to be gambling.  To hold otherwise by concluding these are not "relevant factor[s]" would be "simply illogical[.]"  *Thompson*, 985 A.2d at 936 n.10.

suppression courts to determine whether the Commonwealth has met its burden of proof. Relevant factors in this assessment include the geographic scope of the high-crime area, the nexus between the type of crime the area is known for and the type of crime suspected on the day of the stop, the officer's level of familiarity with the area, the recency of the officer's information, empirical data known to the officer at the time of the stop, and the assignment of specialized police units targeting high-crime areas. In this case, we hold the Commonwealth's evidence supports the suppression court's conclusion that Lewis was in a high-crime area when he fled from the police. We also hold the totality of the evidence gave the police reasonable suspicion to pursue him and recover the gun Lewis voluntarily abandoned. Accordingly, we affirm the Superior Court's order affirming the denial of suppression.

Chief Justice Todd and Justices Mundy and Brobson join the opinion.

Justice McCaffery concurs in the result.

Justice Wecht files a concurring and dissenting opinion.

Justice Donohue files a dissenting opinion.